## THE SKIPTON CASTLE.

### (District Court, N. D. California, First Division. April 3, 1915.)

### No. 15156.

SHIPPING ☞124—LIABILITY FOR DAMAGE TO CARGO—FAILURE IN PROPER CARE.

A shipment on a steamship from Antwerp, Belgium, to San Francisco, of merchandise consisting of mineral water in bottles, baskets, and enamel ware, when delivered, was badly damaged from heat, caused by the heating of bone meal stowed in the hold directly below; the hatchway be-

tween the two holds having been left partially uncovered to permit the circulation of air. That the temperature of such lower hold was much higher than than of the other holds was discovered when the ship was five days out, and such condition continued for many days. The merchandise was known to be of a kind subject to injury from heat, and it appeared that it could have been reached and at least moved sufficiently to permit the closing of the hatch cover. *Held* that, under Harter Act Feb. 13, 1893, c. 105, § 1, 27 Stat. 445 (Comp. St. 1913, § 8029), which makes void any provision of a bill of lading exempting the carrier from liability for loss of damage arising from negligence, fault, or failure in proper stowage or care of merchandise, the ship was liable for such damage for failure of the master to exercise proper care to prevent the same.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 458, 466; Dec. Dig. ⊕⇒124.]

In Admiralty. Suit by the American Import Company and others against the British steamer Skipton Castle. Decree for libelants.

William Denman, of San Francisco, Cal., for libelants.

Ira A. Campbell and McCutchen, Olney & Willard, all of San Francisco, Cal., for claimant.

DOOLING, District Judge. In December, 1910, libelants shipped on board the British steamer Skipton Castle, then lying in the port of Antwerp, Belgium, certain merchandise to be carried from said port to San Francisco. This merchandise, consisting for the most part of mineral water, baskets, and enamel ware, was stowed in the No. 1 between-decks. In the No. 1 hold immediately below was stowed a quantity of bone meal. The hatch between the No. 1 hold and No. 1 between-decks was not entirely closed, but was left with spaces between the boards so that the air from the hold could rise freely into the between-decks. The merchandise, when delivered in San Francisco, was badly damaged; the damage, speaking generally, consisting of the bursting of the bottles containing the mineral water, the molding and rotting of the baskets, and rusting of the enamel ware.

The bills of lading provide, among other things, that the ship "should not be liable for loss or damage occasioned by act of God, * * * sweating, * * * decay, or the indirect causes thereof, contact with, or smell or evaporation from, other goods, * * * injury to wrappers, however caused, * * * heat * * * at any time or in any place, * * * or any other perils of the sea, the negligence, default, or error in judgment of the master, pilot, mariners, engineers, stevedores, or other persons employed in or about the ship." It is claimed that whatever injury was suffered was the result of some one of the enumerated exemptions.

The loading of the vessel at Antwerp was concluded on December 18th, and on that day she left Antwerp and proceeded to Hull, where she arrived on the morning of December 19th. On the morning of December 21st she left Hull for her destination on this coast, via Las Palmas. The loading of libelants' merchandise was completed on December 17th, so that on December 22d, when the temperature of the holds was first taken, as disclosed by the log, this merchandise, allowing for the time required to load and stow it, was on board some-

thing over five days. On December 22d the mean temperature of the No. 1 hold was ascertained to be 101, while the temperature of the air ranged during the day from 52 to 53 and the mean temperature of the other holds was as follows: No. 2, 83; No. 3, 82; No. 4, 83; No. 5, 87; poop, 84. On December 23d the mean temperature of No. 1 hold was 100; the temperature of the air ranging during the day from 53 to 57, and that of the other holds ranging from 80 to 86. So through succeeding days the temperature of No. 1 hold was much higher than that of any of the others, and from 30 to 50 degrees higher than that of the air. On December 29th the Skipton Castle arrived at Las Palmas; the temperature of the holds on that day apparently not having been taken. But on December 30th, while still at Las Palmas, the temperature of No. 1 hold was ascertained to be 110; of No. 2, 85; of No. 3, 85; of No. 4, 82; and of No. 5, 90; while the highest temperature of the air during the day was 65. It was not until January 14th that the temperature of No. 1 hold became fairly uniform with that of the others. No. 1 hold, because of its location, should under normal conditions be, if not cooler than the others, at least as cool as any of them. So that the high temperature of this hold must be attributed to some cause existing therein, and it is not now disputed that it was due to the heating of the bone meal which was there stowed.

It is in evidence that bone meal does not ordinarily heat, and there was therefore no reason to anticipate that it would heat upon this occasion. There is no doubt, however, that it did heat, and that the heat generated by it had free access through the partly open hatch into No. 1 between-decks, where libelants' merchandise was stowed. Everything indicates that the damage to this merchandise is to be attributed to the heat thus occasioned. The question, then, for determination, is whether or no, under the circumstances, the ship is excusable, either under the Harter Act, or because of the exemptions contained in the bill of lading.

Section 1 of the Harter Act provides that it shall not be lawful to insert in a bill of lading any clause relieving from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any merchandise, and that any words or clauses of such import shall be null and void.

Section 2 provides that it shall not be lawful to insert in any bill of lading any agreement by which the obligation of the owner of a vessel to exercise due diligence to properly equip, man, provision, and outfit such vessel, and to make such vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver the same, shall in anywise be lessened, weakened, or avoided.

Section 3 provides that, if the owner of any vessel shall exercise due diligence to make said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agents, or charterers shall be held responsible for damage or loss resulting from faults or errors in navigation or in the management of such vessel, nor shall they be liable for losses arising * * * from

the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or resulting from any act or omission of the shipper or owner of the goods.

The provisions of the bill of lading must be read in connection with the sections of the Harter Act set out above, and none of the exemptions apply, if the shipper prove that the damage arises from negligence in proper loading, stowage, custody, or care of the goods, and no exemption can do away with the obligation of the master properly to care for the cargo while it is in his charge. It is true that, when the damage is shown to result from some of the exempted causes, the burden is upon the shipper to show negligence on the part of the ship. It is contended here that, as to the No. 1 between-decks, the vessel was not seaworthy for the carriage of this cargo, because of the existence of all the elements in No. 1 hold to produce heat, even though such heating was not to be anticipated, and because free access of such heat to No. 1 between-decks was permitted by leaving the hatch partly uncovered, and because the cargo in question was peculiarly susceptible to be damaged by heat.

This is an interesting question, but one which I do not find necessary to determine. The merchandise in question, particularly the mineral water, was stowed in No. 1 between-decks because every one recognized the necessity of having it stowed where it might be kept as cool as possible, and not be subjected to sudden and violent changes of temperature. Yet within five days after it was so stowed it was ascertained that the temperature of the hold immediately beneath it was nearly 50 degrees hotter than the temperature of the air, and nearly 20 degrees hotter than that of the other holds, although it should ordinarily be cooler than any of them. This condition continued day after day; the officers knowing that the hot air of No. 1 hold had free access to No. 1 between-decks, and that the mineral water therein stowed was peculiarly susceptible to heat, and had been stowed there, according to their own testimony, in order that it might be kept as cool as possible. Nothing was done to relieve the situation.

Although the master testified that it would be absolutely impossible, without jettisoning the cargo, to get into any of the lower holds for the purpose of restowing cargo, and that when he found there was a difference of 25 degrees in temperature there was no place to take the cargo out, still it does not appear that it would have been difficult, certainly not impossible, during the fine weather then experienced, and particularly while lying at Las Palmas, to move or raise such portion of the cargo as was on the square of the hatch, and to close the hatch between No. 1 between-decks and No. 1 hold, so that the heated air of the latter might rise through the ventilator without reaching the between-decks. If any of the merchandise in question was then found to be suffering injury because of heat, or because of moisture occasioned by bursting bottles, such portion might have been cared for by drying and airing it. The hatchway between No. 1 between-decks and No. 1 hold was 24 feet long and 16 feet wide, and the depth of No. 1 between-decks was between 7 and 8 feet. The cargo stowed on this partly covered hatch consisted for the most part of baskets. It does not seem

that any insuperable difficulty should attend the raising of such portion of a cargo of basket ware as covered a hatch 24 by 16 feet to a depth of not exceeding 8 feet, or that it would be at all necessary to jettison the same, and I cannot escape the conclusion that the failure to make any effort whatsoever to relieve the conditions then known to exist was such negligence in the care of the cargo as will render the ship liable for the damage occasioned thereby. It is not impossible that the ship may be liable for other reasons suggested by counsel for libelants, but I am satisfied that she *is* liable for the reasons set forth.

A decree will therefore be entered fixing such liability, and the cause referred to the commissioner to ascertain and report the damage.