## THE MILWAUKEE BRIDGE.

Circuit Court of Appeals, Second Circuit.
May 14, 1928.

No. 78.

1. Shipping ⊂⟹132(3¾)—Shipper, suing for damages to cargo, held to have burden of proving negligence.

In libel for damages to cargo of flour, where, unless there was negligence in stowage, custody, care, and delivery of cargo, everything that happened was within exceptions in bills of lading, shipper has burden of proving negligence.

2. Shipping ⊂⟹132(3¾)—Neglect of master in use of water to wash sulphuric acid damaging flour from deck held not shown.

In libel for damage to cargo of flour from sulphuric acid, shipper *held* not to have sustained burden of showing that master was negligent in use of water to wash acid from deck and other drums of acid on which it might leak.

3. Shipping ⊂⟹120—Master held not shown to have been negligent in failing to inspect hold on discovering that drums of sulphuric acid were leaking.

In libel for damages to cargo of flour from sulphuric acid, master *held* not shown to have been negligent in failing to open hatch and inspect hold on discovering that drums of acid were leaking.

4. Shipping ⊂⟹120—Clause of bills of lading authorizing jettison of damaged goods shipped without disclosure of their nature held inapplicable.

Clause in bills of lading authorizing throwing overboard or destroying dangerous goods, shipped without full disclosure of their nature, was inapplicable, where nature of drums of sulphuric acid, damaging cargo of flour, was disclosed.

5. Shipping ⊂⟹138—Failure of master to inspect hold on discovering leaking acid is fault in management of vessel, for which it is not liable (Harter Act, § 3 [46 USCA § 192]).

Failure of master to inspect hold of ship after discovering leaking of drums of sulphuric acid, which damaged cargo of flour, even if negligent, is a fault in management of the ship, for which vessel is not liable, under Harter Act, § 3 (46 USCA § 192; Comp. St. § 8031).

6. Shipping ⊂⟹138—Use of water to rid deck of leaking sulphuric acid held to relate primarily to management of vessel, for which it is not liable (Harter Act, § 3 [46 USCA § 192]).

Action of master in washing drums of sulphuric acid and deck, by which to rid them of acid which had leaked, use of water, diluting acid and aggravating its corrosive qualities, related primarily to the management of the vessel, and not to care and custody of cargo, and hence fell within Harter Act, § 3 (46 USCA § 192; Comp. St. § 8031), relieving vessel of liability.

Appeal from the District Court of the United States for the Southern District of New York.

The libel in this cause was filed in rem by Warner Moore and another, copartners doing business under the firm name and style of Warner Moore & Co., against the steamship Milwaukee Bridge, to recover damages to a large shipment of flour. After the passage of the Suits in Admiralty Act (46 USCA §§ 741–752; Comp. St. §§ 1251¼–1251¼k), the cause proceeded against the United States as owner of the vessel. The latter impleaded the American Trading Company, which shipped 73 drums of sulphuric acid, the leakage whereof was alleged to have been the cause of the damage to libelants' cargo. The alleged negligence of the Trading Company consisted in shipping dangerous cargo, providing defective containers, and failing properly to inspect them, or to notify the master of the vessel of the dangerous character of the merchandise. The United States further impleaded Cory Brothers & Co., Limited, the ship's agents at the port of destination, charging them with liability for a portion of the damage, because of their alleged neglect in failing properly to discharge and segregate the cargo, and to handle it as they ought after the discharge. The Trading Company impleaded Butterworth-Judson Corporation, the manufacturer of the sulphuric acid, alleging negligence in preparing it and in failing to supply proper containers. From a decree dismissing the libel, and the petitions against the three impleaded parties (15 F.[2d] 249), libelants appeal. Affirmed.

The Milwaukee Bridge sailed on September 13, 1919, from Jersey City, bound for Newport News, St. Thomas, Pernambuco, Santos, and other ports; her final destination being Buenos Aires. Prior to her sailing from Jersey City, a shipment of sulphuric acid in iron drums was loaded on the deck of the vessel. The shipment, which was made by the American Trading Company and was destined for Santos, consisted of 73 drums, which were stowed on the after part of the forward well deck on each side of the No. 2 hatch coaming. The drums were stowed on end, one tier high, and were lashed with rope and wire and properly dunnaged.

Libelants' cargo consisted of 23,000 sacks of flour, shipped at Newport News under 14 bills of lading, which were made out to the order of the shipper; 8 different consignees being named therein as the parties to be notified. The flour was stowed in Nos. 1, 2, and 3 holds in the bridge deck space, about one-third of the shipment being stowed in No. 2 hold. The vessel sailed from Newport News on September 16, 1919, and arrived at St.

Thomas on September 22. Prior to arrival at St. Thomas, and on September 20, some of the drums of acid were found to be leaking. Thereupon officers of the vessel played a hose upon the drums and the deck to wash away the acid, and jettisoned four of the drums, in which leaks were discovered. On September 24, and again on September 27, a single drum was found leaking and jettisoned, and on September 29 two were found leaking and thrown overboard. On October 1 another drum that began to leak was thrown overboard. A hole was punched in it first, and the contents allowed to run on deck, because the ship was rolling at the time, and the drum was so heavy that it could not be handled in the sea that was running until it was emptied. After arriving at Pernambuco, on October 4, the drums were discharged upon a lighter, and, in so doing, one was broken in the slings; but the contents fell upon the lighter, and not on the deck of the ship. The flour was discharged at Pernambuco, and the drums were then reloaded and 14 of them, which were found to be leaking, were dumped overboard after the ship got outside. Still another leaking drum was dumped at Rio de Janeiro, so that 25 drums, out of the original 73, were disposed of before the residue was finally discharged at Santos.

During the voyage from Newport News to Pernambuco, as soon as a drum was discovered leaking, it was cast overboard, and the chief officer testified that a stream of water was continually played upon the remaining drums, to wash away the acid that might get on them or spread on the deck. The leaking was said to become apparent from steam, which would arise as soon as the acid exuded from any drum.

The damage to the flour was not discovered until No. 2 hatch was opened at Pernambuco, on October 6, in order to discharge the cargo. It was reported to Chief Officer Milde, who saw bags stained and damaged by acid and water. The captain then was notified, and he examined the damaged cargo, and informed Cory Bros. & Co. that the deck had been leaking and the flour was damaged, called a consul's survey, had the acid drums discharged into a lighter, and had the decks washed to get all the acid off them. Rivets were found in the deck covering eaten away by the acid. These were replaced, and others which had been loosened by the riveting were tightened, and the seams were caulked at small expense before the ship reloaded the drums. Under the corroded rivets was the flour which was damaged. There was no credible testimony that the riveting of the deck plates was defective in ways not due to acid corrosion.

Cory Bros. & Co. employed stevedores to discharge the vessel, and Percy Daniel, the assistant to Cory Bros.' manager, testified at the trial that he pointed out to Coura, the custom house official, who was directing the discharge of the cargo, that the flour was damaged.

While Coura testified that he notified Cory Bros., instead of receiving notice from them, this difference in the testimony is unimportant, for Coura said that it was not likely that damaged goods were removed from the vessel prior to his knowledge of their condition in the hold, because the flour was stowed clear up to the hatch. He could, therefore, readily see the damage as soon as the hatch was opened.

The stevedores separated 353 bags on the ship, seriously damaged by acid and water. These were lowered to the dock, and were probably all placed in a shed outside the warehouse in which the remainder of the flour was stored. Along with the flour placed in the warehouse were certain bags of flour damaged by acid and water, other than the 353 put in the shed. Nine hundred and eighty-two bags were ultimately held by a judicial survey to be unfit for consumption, but these not only included all the bags damaged by acid and water, but bags damaged by weevils and other causes. In separating the 353 damaged bags on the ship from the others, the stevedores probably went as far in the separation as was then and there practicable. But the later commingling of good with damaged flour in the warehouse, when the disposition of the merchandise was under the management of the Brazilian customs, was the cause of most of the subsequent trouble.

The flour from the four different holds was discharged into separate piles on the dock. The only flour damaged by acid was in hold No. 2. But the dock and custom house employees apparently combined the flour from the different holds, separating it only as to marks. Hence an examination of all the bags was thought necessary by the authorities before allowing delivery.

The law of Brazil and the usage of the port of Pernambuco placed upon the custom house officials the duty of taking delivery of the cargo from the ship's tackles, ascertaining the fact of any damage, and separating damaged from sound merchandise. This was shown at the trial by three experts versed in the law of Brazil and the customs at the port of discharge.

The department of health at Pernambuco at first condemned the whole shipment of flour. Finally representatives of the cargo owners went to Pernambuco, and a judicial survey was had, which resulted in condemnation of the 982 bags only. This involved great delay, so that the other flour was not delivered by the Brazil authorities to the consignees until about the end of February, nearly five months after the vessel was discharged. By delay in a tropical climate, many bags of the flour, which were uninjured by sulphuric acid, had become injured by weevils, worms, and general deterioration. The excess of damaged bags in the total of 982 over the 353 originally separated was probably in substantial part due to this delay. There was also deterioration of the remaining flour, probably caused by the delay.

It is undoubtedly true that the customs authorities did not take sufficient care to see that all the wet and stained bags of flour were separated from the bags showing no damage before being placed in the warehouse. The possibility of damage was apparent, and could only be determined by careful analysis. These bags were unloaded after the bags from the holds which contained no injured flour, so that segregation was practicable and apparently not difficult. The neglect to make this separation caused some of the deterioration after the merchandise was landed. The ship was then under no further duty in respect to the cargo, both by the Brazil law, the custom of the port, and the following clause stamped on the bills of lading:

"After goods have been delivered to the custom house or other authority in accordance with the Brazilian custom house regulations, the shipowners or agents are not responsible for any act of the custom house with regard to the delivery. * * *"

The bills of lading contained clauses relieving the vessel from loss or damage arising "from frailty or insufficiency of packages, or other insufficiently protected property"; also provisions in clause 2 that:

"The ship shall not be liable for loss or damage, before, after or during loading or discharge, occasioned by * * * drainage, leakage, breakage, * * * nor for any loss or damage from stowage or contact with or smell or evaporation or taint from other goods, as all vessels of this line carry general cargo, and any lawful merchandise not excepting kerosene and other products of petroleum, spirits of turpentine, oils, and other liquids. * * *"

The Milwaukee Bridge was a new vessel, proceeding on her second voyage. She showed no signs of leaking on the previous voyage, was inspected before starting on the voyage in question, and seems to have been in all respects seaworthy. She was manned by an experienced master, officers, and crew.

The goods shipped by the American Trading Company were cargo of a character likely to do damage if there was leakage, but they were manufactured by Butterworth-Judson Corporation in a careful manner and were shipped in proper containers. There was in general good weather on the voyage.

Judge Thacher, before whom the case was tried, held that damage subsequent to the discharge was due to the action of the local authorities, and was by no theory recoverable. As for the damage prior to the discharge, he held that it came within the exceptions in the bills of lading, because the vessel was seaworthy, and the negligence, if any, was not in the stowage, care, custody, or delivery of the cargo, but was a fault or error in navigation, or in the management of the vessel, for which neither the ship nor her owners were liable, within the third section of the Harter Act (46 USCA § 192; Comp. St. § 8031).

Kirlin, Woolsey, Campbell, Hickox & Keating and Bigham, Englar & Jones, all of New York City (D. Roger Englar, Ira A. Campbell, Alfred Ogden, and Roger B. Siddall, all of New York City, of counsel), for appellants.

Charles H. Tuttle, U. S. Atty., of New York City (William E. Collins, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Choate, Larocque & Mitchell, of New York City (Joseph Larocque, of New York City, of counsel), for appellee Cory Bros. & Co., Limited.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Theodore Kiendl, of New York City, of counsel), for appellee American Trading Co.

Rushmore, Bisbee & Stern, of New York City (Bertram F. Shipman, of New York City, of counsel), for appellee Haight Receiver of Butterworth-Judson Corporation.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). [1] The drums of sulphuric acid were lawful cargo, but possessed dangerous potentialities. They were properly stowed on deck, which was the usual place for such cargo. Unless there was negligence on the part of the ship in stowage, custody, care, and proper delivery of its car-

go, everything that happened while the cargo was within its control came within the exceptions in the bills of lading. In such circumstances, the burden of proving negligence was upon the shipper. The Isla de Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603, affirming (C. C. A.) 292 F. 723; The Bencleuch (C. C. A.) 10 F.(2d) 49; The Arpillao (C. C. A.) 270 F. 426; Dolbadarn Castle (C. C. A.) 222 F. 838; Konigin Luise (C. C. A.) 185 F. 478.

There are, of course, cases like C. Lopez y Lopez (C. C. A.) 297 F. 457, where the character of the damage indicates bad stowage. There oil was found to have damaged a cargo of cork. It was denied that the oil was stowed near the cork, but this court held that the presence of the oil on the cork showed the proximity, and that stowage of cork next oil containers which might leak was negligent. As Judge Hough said, at page 458: " * * * Negligence as an inference of fact is fairly established, and the ship is liable notwithstanding the exception, which cannot prevail over negligence."

But we know all about the stowage here. The drums were not placed next the flour, but on a solid, tight deck of a new ship, which had carried a cargo of sugar on the previous voyage safely and without wetting, though she had passed through heavy rains that washed her decks continually.

[2] It is contended that, when acid begins to leak, the use of water dilutes the acid and aggravates its corrosive qualities. This is in some respects true, but the use of the water was to wash the acid from the deck and the other drums on which it might leak, in order to prevent it from eating away either drums or deck. The method adopted did not fully effect the desired object, but it cannot be said that it was not a good method under the circumstances. As a matter of fact, it undoubtedly proved a great saving of loss. It must be remembered that no such damage as is claimed was due to the sulphuric acid. The only flour finally condemned was 982 out of 23,000 sacks, and of the 982 sacks certainly a large proportion was injured by the neglect of the customs authorities to separate the good merchandise from the bad before placing the flour in the warehouse. As a result of this initial blunder and the delay consequent to it, there was a large amount of damage by weevils and white worms, which were working in the tropical climate upon much of the flour not injured by the acid. If the damaged flour had been promptly separated in the beginning, it may be doubted whether there would have been acid damage to more than 3 per

cent. of the merchandise at worst. It would thus seem that the method adopted of washing away the acid to protect the deck was relatively successful, both in protecting the deck and caring for the cargo.

[3] It is also argued that the master should have opened No. 2 hatch at the port of St. Thomas, when he knew the drums had begun to leak. It is not shown what he could practically have done that he did not do, if he had discovered at St. Thomas that the deck had been leaking, nor is there probability that the deck had then begun to leak, for the ship arrived there September 22d, only two days after the trouble with the first drums had occurred. It can hardly be supposed that the acid would have eaten away the rivets in two days.

[4] It is further said that the cargo of sulphuric acid was only worth about $2,000, and that all of it should have been jettisoned as soon as a number of the drums had begun to leak. Such action it is thought would have been justified under clause 5 of the bills of lading, providing that "dangerous goods, shipped without full disclosure of their nature, * * * may be thrown overboard or destroyed at any time without compensation." But the nature of the sulphuric acid was disclosed, so that this clause would not apply.

[5] It may be easy enough now to suggest a means of averting the damage which threatened the ship and the cargo, but the master had to deal with an emergency, and it has not been shown that he did not act with due care. The Germanic, 196 U. S. at page 595, 25 S. Ct. 317, 49 L. Ed. 610. It must always be remembered that the burden of proof is on the shipper. That burden has not been sustained. Moreover, such an act as failure to inspect the hold at St. Thomas, even if negligent, has been held by this court to be a fault in management of the ship, excusable under section 3 of the Harter Act. United States v. N. Y. & O. S. S. Co. (C. C. A.) 216 F. 61.

[6] But the ship could in no event be liable, for the washing of the drums and deck to rid them of the acid related primarily to the management of the vessel, and not to the care and custody of the cargo. Her case, therefore, fell within the third section of the Harter Act.

While it is true that the master admitted that he knew that he was carrying an extremely dangerous cargo, which, with any leakage, might very quickly eat through the deck and around the rivets, so as to produce leakage into cargo compartments, there can be little doubt that the means adopted to pre-

vent this were means primarily to protect the ship as a whole. They were calculated to preserve its decks, and to avert what might become a serious source of leakage in the event of heavy seas. To be sure the tightness of the deck protected the cargo, just as the iron shutters carelessly left open in The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, had they been closed, would have prevented water from coming in, in rough weather, and damaging the cargo; yet the Supreme Court said in that case that the words "navigation" and "management," in the Harter Act (46 USCA §§ 190-195; Comp. St. §§ 8029–8033, 8035), "include, at the least, the control, during the voyage, of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroad of the seas; and if there was any neglect in not closing the iron covers of the ports, it was a fault or error in the navigation or in the management of the ship."

In The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610, where the negligent acts in failing to keep the ship trimmed. while unloading the cargo were held not to be faults in management, because the primary purpose was to get the cargo ashore, Mr. Justice Holmes said that the determining factor is "the primary nature and object of the acts. which cause the loss."

It was held in The Skipton Castle (D. C.) 223 F. 839, affirmed (C. C. A.) 243 F. 523, where the master failed to open a hatch in order to prevent overheating of the cargo, that the fault was in the care of the cargo and not in the management of the vessel. It was also held by this court in Andean Trading Co. v. Pacific Steam Nav. Co., 263 F. 559, where hatches were carelessly left open for ventilation of cargo, through which water entered, that the case was not within section 3 of the Harter Act, but was an "act in the care and custody of the cargo" for which the shipowner was responsible under section 1 (46 USCA § 190; Comp. St. § 8029). In both these cases the faults related primarily to the cargo.

Here the use of water to wash away the acid, while protecting the cargo, was primarily for the ship as a whole, and seems to bring the case within the doctrine of The Silvia and The Germanic, supra.

In the recent decision of the Court of Appeal in the case of Gosee Hillerd v. Canadian Government Merchant Marine, Limited, reported in Lloyd's List Law Reports of December 15, 1927, [1928] 1 K. B. ——, a majority of the court held that rain entering between deck hatches, left open through the negligence of the ship's officers while the vessel was being repaired, was a fault in the management of the vessel.

There seems to have been no ground for bringing in Cory Bros. & Co. or the American Trading Company upon any theory. The receiver of Butterworth-Judson Corporation may have been more properly impleaded, but the case against him is based purely upon the theory (contradicted by proof of the mode of manufacture) that the sulphuric acid was too much diluted, and therefore quickly corroded the drums, or that the drums must have been bad when they left the possession of the receiver, because they soon began to leak. We cannot know what might have happened to these drums while they were being loaded on shipboard, or whether some rolling of the ship might not have caused one or more to leak. There is no doubt that the leakage of any of them was a peril to the rest, and might have started many others leaking; but we cannot say that the leakage was due to defective construction, or began before September 20. As soon as it started, the plan for preventing its spread to the other drums seems to have been reasonable, even though not entirely successful.

The negligence of none of the appellees has been established, and the Milwaukee Bridge was not in any event liable, because protected by the provisions of section 3 of the Harter Act.

The decree is affirmed.