Nott, Ch. J.,
delivered the opinion of the court:
In this case the court held that where, in March, 179.8, a vessel sailed for a belligerent port, but under a false destination, and the owners of the vessel were the owners of a contraband cargo, she was liable to seizure and condemnation on the return voyage; and the court in its opinion said: “Where the owners of a vessel were the owners of the cargo, the vessel as well as the cargo was subject to confiscation; and where the vessel carrying contraband was falsely documented, or cleared for a false destination, or was guilty of fraud, the liability to confiscation attended the entire voyage, that is to sajq from the home port back to the home port, and to the cargo on the' return voyage, though it might be innocent. There can be no doubt but that such was the recognized law of nations at the close of the eighteenth century. (The Joseph, 8 Cranch, 451-454; Carrington v. Merchants’ Insurance Co., 8 Peters R., 494-520.)”
The question involved in this case was not involved in the case of Carrington (supra), and that case, therefore, is not an authority decisive of this question; but Mr. Justice Story, in reviewing the decisions relating to the subject, states in the following paragraph their scope and effect:
*223 “But in the highest prize courts of England, while the distinction between the outward and homeward voyage is admitted to govern, jmt it is established that it exists only in favor of neutrals, who conduct themselves with fairness and good faith in the arrangements of the voyage. If, with a view to practice of a fraud upon the belligerent and to escape from his acknowledged right of capture and detention, the voyage is disguised and the vessel sails under false papers and with a false destination, the mere deposit of the contraband in the course of the voyage is not allowed to purge away the guilt of the fraudulent conduct of the neutral. In the case of the Franklin, in 1801 (3 Bob., 217), Lord Stowell said: ‘I have deliberated upon this case, and desire it to be considered as the settled rule of law received by this court that the carriage of contraband with a false destination will make a condemnation of'the ship as well as the cargo.’ Shortly afterwards, in the case of the Neutralitet, 1801 (3 Bob. B., 295), he added: ‘The modern rule of the law of nations is certainly that the ship shall be subject to condemnation for carrying contraband goods. The ancient practice was otherwise; and it can not be denied that it was perfectly justifiable in principle. If to supply the enemy with such articles is a noxious act with respect to the owner of the cargo, the vehicle which is instrumental in effecting that illegal purpose can not be innocent. The policy of modern times has, however, introduced a relaxation on this point; and the general rule now is that the vessel does not become confiscated for that act. But this rule is liable to exceptions. Where a ship belongs to the owner of the cargo, or where the ship is going on such service under a false destination or false papers, these circumstances of aggravation have been held to constitute excepted cases out of the modern rule, and to continue them under the ancient rule.’ The cases in which this language was used were cases of capture upon the outward voyage. The same doctrine was after-wards held by the same learned judge to apph^ to cases where the vessel had sailed with false papers and a false destination upon the outward voyage, and was captured on the return voyage. And, finally, in the cases of the Bosalia and the Elizabeth, in 1802 (4 Bob. B., note to table of cases), the lords of appeal in prize cases held that the carriage of contraband outward with false papers will affect the return 'cargo with condemnation. These cases are not reported at large. But in the case of the Baltic (1 Acton’s B., 25) and that of the Margaret (1 Acton’s B., 333) the lords of appeal deliberately reaffirmed the same doctrine. In the latter case Sir William Grant, in pronouncing the judgment of the court, said: ‘The principle upon which this and other prize courts have generally proceeded to adjudication in cases of this nature (that is, *224 where there are false papers) appears simply to be this, that if a vessel carried contraband on the outward voyage she is liable to condemnation on the homeward voyage. It is by no means necessary that the cargo should have been purchased by the proceeds of this contraband. Hence we must pronounce against this appeal; the sentence (of condemnation) of the court below being perfectly valid and consistent with the acknowledged principles of general law.’”
But apart from the decisions upon this question, this court has no doubt of the correctness of the rule laid down, and would so decide if the question were altogether new.
The term “voyage” has no fixed or technical meaning. The seamen who shipped on this American vessel “for the voyage ” knew perfectly well that they would constitute the crew until the vessel returned to the home port. A voyage from Boston to Liverpool and the north of Europe, and thence directly or indirectly to the United States, is one entire voyage. (The Joseph, 8 Cranch R., 451.) For descriptive convenience we speak of the outward voyage and the homeward voyage, and there are cases where the application of the law is varied accordingly in effect.
The cases where a homeward voyage has lessened the liability of the vessel to condemnation are cases where the homeward voyage has been from an honest destination. A vessel may be driven out of her course by stress of weather and may seek another port than that intended, and sell her cargo and return home, but that is a very different thing from clearing fraudulently for a neutral port and carrying contraband goods to a belligerent. In this case the Lucy cleared for Surinam, but never went there, and never intended to go there. She was not captured on a return voyage from Surinam to New London. Necessarily her fraudulent destination would affect her movements until her return to her home port. In sailing to a false destination she predetermined the fact that on her return voyage she would sail from a false destination. There is no such thing as a perfectly innocent homeward voyage from a false destination.
A party who has been guilty of a fraud can ask nothing from a court so long as any of the consequences of his fraudulent conduct affect the transaction for which he seeks relief. *225 The well-known maxim that a person seeking relief in equity must come with clean hands is as potent in prize, courts or in international tribunals as in courts of equity. In the excitement and suspicion which are a part of war a belligerent is entitled to plain, straightforward conduct on the part of neutrals trading with his enemy. Fraud, deception, and improper attempts to deprive a belligerent of his belligerent rights tend to embroil friendly nations in dispute and misunderstanding; and it is for the welfare of the neutral as well as of the belligerent nation that a transaction stained with them be stamped as unlawful, without justification, and without redress.
The order of the court is that the claimants’ motion for a new trial be overruled.