## THE BUCKINGHAM.

STEAMSHIP BUCKINGHAM CO., Limited, v. PACIFIC TRANSPORT CO. et al.

(District Court, E. D. Pennsylvania. April 22, 1904.)

Nos. 12, 15.

1. SHIPPING—CHARTER—COMMENCEMENT OF VOYAGE.

A steamer under a time charter was delivered to the charterer at Seattle, her first voyage to be to an Alaskan port. She took on some coal at Seattle, and then proceeded to other ports, where she took on cargo and a further supply of coal; proceeding thence to Alaska, and returning to Seattle, where she was again taken in charge by the charterer. *Held*, that the voyage began at Seattle, and not at the last port of loading.

2. SAME—DAMAGES CLAIMED BY CHARTERER.

A time charterer who compromised and settled a claim for demurrage against a consignee cannot assert a claim for the balance which was in dispute, against the vessel, on the ground that he could have recovered in full but for the master's misconduct.

3. SAME—DEDUCTIONS FROM CHARTER HIRE.

Evidence considered, and *held* not to establish the claims of a charterer to various deductions from the charter hire of a steamer.

In Admiralty.

Henry R. Edmunds, for Pacific Transport Co.

Convers & Kirlin and J. Parker Kirlin, for the steamship.

J. B. McPHERSON, District Judge. 1. The Buckingham is a British steamship, and was chartered to the Pacific Transport Company and James Griffiths for eight shillings and sixpence per ton, gross register, under a time charter, for the period of six months. Delivery of the vessel, which was on a voyage from Hong Kong to Tacoma when the contract was made, was accepted by the charterers at Seattle on May 27, 1901. The charter party contained the provision that the ship might be employed "in such lawful trades as the charterers or their agents shall direct, but not north of Vancouver, and no part of North America except Pacific side." This restriction was modified by cable a few days before the ship was delivered, so as to permit the charterers to make one voyage to St. Michael's, Alaska, for which privilege they were to pay the additional hire of two shillings and sixpence per ton. This voyage was the first enterprise upon which the ship was to enter, and the first subject of dispute now is: When did the voyage begin and end? The relevant facts are as follows: Immediately upon delivery of the vessel the charterers loaded some bunker coal, and on May 29th the ship left Seattle for Nanaimo, another port on Puget Sound, where she took on board a further supply of bunker coal and about 75 tons of cargo for St. Michael's. On May 30th she crossed the sound to Vancouver, where she loaded a general cargo of 2,400 tons; leaving that port on June 6th, and recrossing the sound to Ladysmith, where she completed her cargo by loading 2,000 tons of coal. She left Ladysmith on June 10th, and proceeded directly to St. Michael's, merely touching at Victoria to put the pilot ashore. She returned to Puget Sound on July 30th, making a brief stop only at Port Townsend, and arrived at Seattle four or five hours later on the same day, where she was again taken in charge by the charterers, and accounts for the voyage were settled with the master. On these facts, I agree with the position taken by the proctors for the Buckingham, that the voyage began and ended at Seattle. The charterers' contention that the voyage did not begin until June 10th, when the ship left her last port of loading with a complete cargo, finds no support in the authorities. No decision was cited in which the point has been so ruled, but there are several cases in which it has been distinctly decided that a voyage begins when a ship sets about doing what is to earn freight for the owner. Bruce v. Nicolopulo, 11 Exch. 129, questioning the authority of Crow v. Falk, 8 Q. B. (55 E. C. L.) 467; Barker v. McAndrew, 18 Com. Bench (N. S.) 114 E. C. L. 758; Valente v. Gibbs, 6 Com. Bench (N. S.) 95 E. C. L. 270; The Carron Park, 15 Prob. Div. 203; Nottebohn v. Richter, 18 Q. B. D. 63; Fearing v. Cheeseman, 3 Cliff. 91, Fed. Cas. No. 4,710. The English cases are summarized in Carver's Carriage by Sea (3d Ed.) § 148, in the following language:

"A doubt sometimes arises as to when during the agreed voyage the ordinary exceptions of perils apply. Do they relate only to that part of it in which the ship is carrying the charterer's goods? Or do they also cover risks which frustrate or delay the voyage before the goods are taken on board? Say, in going to the port of loading, and during the loading there.

"Where such and such perils are to be 'always excepted,' the shipowner seems to be relieved from liability for any failure to perform his contract, if caused by those perils, whenever they may have occurred. But where the

clause runs 'during the voyage always excepted,' as it frequently does, there may be an ambiguity in the word 'voyage.'

"If the vessel is to proceed to a different port from that at which she is lying, and load there, the voyage thither is considered to be part of the chartered voyage, even though the vessel be allowed by the charter to take, and in fact takes, a cargo outwards for other merchants, and although in doing so she proceeds first to another port, out of the route to the loading port. And if the vessel is prevented or delayed in getting to the loading port, or if the loading is prevented, or a loss occurs during the loading at that port by a peril excepted 'during the voyage,' the exception applies.

"So, again, where the vessel is lying at her port of loading, if she has to move from the place at which she is lying to a loading berth, the 'voyage' to which the exceptions relate commences as soon as she breaks ground to go to that berth.

"But it seems that the exceptions do not apply to matters which may happen before the ship has entered upon the voyage dealt with by the charter party. So that, if she were disabled by perils of the sea while still completing a voyage on which she was engaged at the time of chartering, the shipowner would not be excused.

"If the ship is to be loaded at the place where she is lying, it does not appear to be settled whether the 'voyage' may begin before she has commenced her transit, in such a sense that the exceptions may relate to risks during or prior to the loading. In Crow v. Falk it was decided that it did not. But that decision has more than once been dissented from."

In view of these authorities, I think it is clear that the point must be decided against the charterers' contention.

2. The second ground of dispute concerns the sum of $67.50 that was paid to three Japanese firemen who were employed by the master at Ladysmith. The owners were bound by the charter party to furnish a full complement of officers, seamen, engineers, and firemen for a vessel of the Buckingham's tonnage, and to pay their wages. The charterers' contention is that this sum of $67.50 was paid to the firemen as wages for doing that particular work, and therefore is not a proper charge. The evidence satisfies me, however, that the money was not paid for firing, but for work done in discharging the cargo at St. Michael's, and was paid by the express authority of the charterers themselves. Indeed, the item appeared in the account rendered by the master of the Buckingham on his return to Seattle, and was approved and paid by the charterers at that time without objection. No reason whatever has been shown for opening that settlement, and the objection to this item seems to be an afterthought, probably suggested by subsequent controversies over other matters.

3. A similar remark may be made concerning the charterers' claim of $108, which is said to be an overcharge for boarding several men who were sent by the charterers to St. Michael's to help in discharging the cargo. These men were not seamen, nor in the employ of the ship, but were carried by the captain without other charge than $1 per day for boarding. The charterers claim that 40 cents per day is the usual rate paid upon the Pacific Coast for boarding, but I do not think it necessary to decide whether the claim is well founded, for this item also was included in the account rendered by the master upon his return, and was paid without a word of objection, and no reason has been shown for opening that settlement.

4. The charterers further assert that they should be allowed the sum of $1,900 for damages suffered by the wrongful conduct of the master of

129 F.—62

the Buckingham at the port of St. Michael's. Upon this point the libel contains the following statement:

"That on the arrival of the said vessel at St. Michael's it was the duty of the said master, under the terms of the charter party, to proceed to a place designated by the consignee of the cargo, to discharge the same, but the master did not and would not proceed to the place so designated until the consignee paid him the sum of $100. That, on account of the misconduct of the master in this behalf, the vessel was detained eight days, whereby libelants sustained damages in the sum of $300 per day, or $2,400. That libelants have only received $500 on this account, leaving a balance still due libelants from the owners of the vessel of $1,900."

To make the meaning of this paragraph clear, it is necessary to state what took place at St. Michael's. When the Buckingham reached the port on June 28th, the harbor was still closed by ice, and the ship came to anchor in 33 feet of water about 5½ miles out in the open roadstead. Her draft at this time was nearly 23 feet. The captain walked ashore on the ice, entered the ship at the customhouse on the 29th, and notified the two consignees of the cargo on the 30th; but, as long as the ice remained, it was impossible to begin unloading. The ice went out on July 3d. The customhouse declared the harbor open on July 4th, and on that day the ship moved to a point about 4 miles from the town, and again anchored in 33 feet of water. The work of discharging went on from July 4th to July 15th, when the vessel was again moved a mile nearer the shore, where she lay in about 24 feet of water. On July 13th the general cargo was completely discharged, and also a portion of the coal that constituted the remainder of her load. On that day the consignee of the coal, the Northern Commercial Company, asked to have the ship brought further in, but the master at first refused, because he regarded the conditions as unsafe, and repeated his refusal shortly afterward. The consignee then offered the master $100 if he would do as he was asked, and he finally consented and accepted the money, but upon the further condition that one of the consignee's steamboats should be lashed alongside, that a competent pilot should take the ship in without obliging her to use her own steam, and that she should be helped out of the harbor if bad weather came on. The discharge of the coal was completed on July 19th, and the master thereupon presented a claim for eight days' demurrage, contending that the lay days expired on July 13th, counting the time from July 1st, while the consignee contended that the time should not be counted before July 5th, conceding that four days' demurrage was due, and signing a letter to that effect. The agreed rate of demurrage was $300 per day, but, as the master had no authority to collect any money on this account, the dispute was referred to San Francisco for adjustment. It was there taken up by counsel, and, after considerable negotiation, was compromised by the payment of $500 to the charterers. The agreement concerning the carriage of the coal provided that the ship should take it to St. Michael's, "or as near thereto as the vessel can safely get," and the consignee's objection to the charterers' claim for eight days' demurrage was that the master did not bring the Buckingham as close as he might have done with safety, and thus increased the cost and delay of discharging. The charterers now assert that they were entitled to claim eight days'

demurrage, and that they could have collected it from the consignee if the master's refusal had not furnished the company with a valid counter-claim which compelled the compromise for $500. Accordingly it is now sought to recover from the ship the balance of $1,900.

To the allowance of this item I think there are several objections. First, the charterers have offered no evidence from which the dispute can be satisfactorily determined. The charter for the carriage of the coal was not produced, and there is not sufficient evidence otherwise concerning the number of lay days, and the time when they were to begin. Second, since the charterers elected to compromise the dispute with the consignee, and accepted $500 in full settlement, it is not easy to see upon what ground they can set up this claim against the ship. It is by no means clear that they could have recovered $2,400 from the consignee; and I confess I do not see how they can transform a claim against the consignee for demurrage, that has already been settled and ended, into a live claim against the ship for the misconduct of the master. But, third, I do not find the needful evidence that the master's conduct was wrongful. Without going into the details of the testimony, I am satisfied that he acted with caution and propriety. He was careful of the ship in a strange harbor, as he was bound to be, but there is no evidence at all that he kept the ship as far out as possible in order to extort money for bringing her in. The consignee made no claim at the time that its rights were being disregarded, but urged the master, simply as a favor, to come closer to the shore, and paid the $100 as a gratuity in recognition of this service. At the end of the discharge the consignee was so well satisfied as to pay the master $25 more as a further expression of satisfaction. Moreover, by express agreement, the master was the charterers' agent in the discharge of the cargo, and for this service he was paid $250. Mr. Griffiths, one of the charterers, testified that "his conduct was very satisfactory in regard to the discharge." Surely, to permit the recovery of this item of $1,900 from the ship in the face of these objections, is scarcely possible.

5. The charterers have deducted £122 7s., hire for three days, which are said to have been lost on the second voyage, because of the vessel's failure to furnish a full complement of firemen. It appears from the testimony that on August 9th, a few days after the return from St. Michael's, the vessel was ordered to Vancouver. Her three firemen had refused duty, and three laborers were employed, who fired the vessel on the trip to Vancouver. Here the refractory firemen were arrested and imprisoned for 24 hours, after which they deserted the ship altogether. The captain made efforts to obtain men to take their places, but was unable to do so, and after remaining at Vancouver until August 15th the ship was fired across Puget Sound to Nanaimo by the engineers and the donkeyman. No time was lost upon this passage, which only occupied a few hours. The testimony has satisfied me that the delay at Vancouver was due, not to the absence of the firemen, but to the failure of the charterers to furnish money to disburse the ship at that port. They had agreed to furnish money to the ship for a commission of 2½ per cent., and it was their delay in furnishing the necessary funds that compelled the ship to remain at Vancouver for two of the three days

that are now in controversy. With regard to the remaining day, which is averred to have been lost on the voyage between Vancouver and San Francisco, I am also of opinion that the testimony does not establish the charterers' contention. As I have already said, no time was lost on the passage to Nanaimo. When the ship left that port she was still without firemen, but arrangements had been made with three of the crew, the donkeyman, and one of the engineers to perform this duty. She stopped at Victoria in another effort to obtain firemen, and spent 15 or 16 hours in the vain attempt to secure them. There seems to have been a strike at that time among the firemen along the Pacific Coast, but, for whatever reason, the effort was unavailing. The time spent at Victoria was undoubtedly lost by reason of the ship not having a full complement of men, and for this loss the charterers would be entitled to an allowance, if it were not for the fact that the charter party expressly provides that for delay arising from such a cause no allowance is to be made unless the delay is longer than 24 hours. It follows, therefore, that the loss and expenses which the charterers claim to have suffered by reason of the delay cannot be allowed.

6. Neither, as I think, is the claim to be allowed for a further delay of 37 hours at San Francisco any better founded in fact. The charterers aver that the captain improperly refused to accept a cargo of dynamite that was offered him on Saturday, August 31st, and that he should have received it at that time, and immediately proceeded upon a voyage to Noyo, a port further south on the California coast, instead of delaying to sail until Tuesday morning following. As I read the testimony, however, the facts are otherwise. The dynamite was not offered to the captain before Monday, when it was received, after proper provision had been made for its careful stowage. The ship did not sail upon Monday, because the shippers of the cargo had sent on board 14 men, who were to be transported to Noyo to unload the cargo there; and, owing to certain customs regulations, they could not be carried upon a British vessel between two American ports without being put upon the ship's articles. In order that this formality might be observed, it was impossible to sail before Tuesday morning.

7. There remain for consideration three items which the ship avers have been improperly deducted from the hire due by the charterers. One is the sum of $11.47, excess of exchange upon London over the true rate, charged upon cash advanced to the master; the second is $108.75, being an overcharge for bunker coal furnished to the ship's galley; and the third is $100, charged for the use of certain gear belonging to the charterers on board the ship. In my opinion, all of these sums have been improperly deducted. The uncontradicted testimony shows that the rate charged for exchange was one penny too high, and this amounts to the disputed sum of $11.47. With reference to the second item, the testimony satisfies my mind that the charge for coal was much too high, and that no more than about 105 tons were probably consumed, for which the charterers have been paid in full. As for the use of the charterers' gear at Barbadoes while the vessel was being repaired, the only competent evidence upon the subject goes to show that, if any of it was used, it was a comparatively insignificant por-

tion; and, moreover, as all the gear was afterwards sold to the ship for $30, it seems out of all reason to charge $100 for the use of only part of it for a short time.

Decrees may be entered in accordance with this opinion.