## THE WILLOWPOOL.

### JOHN W. HIGMAN & CO., Inc., v. POOL SHIPPING CO., Limited, et al.

District Court, S. D. New York.

Sept. 6, 1935.

Hill & Rivkins, of New York City (Robert E. Hill, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Michael F. Whalen, of New York City, of counsel), for respondents.

HULBERT, District Judge.

This is a suit in admiralty to recover damages to a shipment of china clay and ball clay.

The libelant is a corporation organized under the laws of the state of New York, engaged in the importing business at 24 State street, borough of Manhattan, city of New York.

The respondents are corporations organized under the laws of the Kingdom of Great Britain, engaged in the business of common carriers of merchandise by sea for hire.

Sir R. Ropner & Co., Limited, operated the steamship Willowpool and other vessels for the account of Pool Shipping Company, Limited, the owner thereof.

All of the jurisdictional facts are conceded.

The steamship Willowpool is a steel-hull steam vessel built in 1925 of 4,815 gross and 2,978 net tonnage (8,060 dead weight), having six hatches, three foreside of the engine room and three aft, and four holds, of which No. 1 and No. 2 are forward of the engine room. In No. 1 hold there are battens running fore and aft up and down the ship's side about 6 or 8 inches apart; one large bilge fore and aft; one tank on the bottom 67½ feet long, capacity 171½ tons of water; two steel collision watertight bulkheads, one dividing the forepeak tank and the other dividing No. 1 and No. 2 holds; two large ventilators, one on each side, lead into No. 1 hold. The forepeak tank is right in the bows of the vessel and divided from No. 1 hold by said steel water-tight bulkhead, 22′ 3″ from the stem of the ship, and has a capacity of 162¼ tons of water. The bulkhead separating this tank from No. 1 hold is secured to the ship's side by angle bars and rivets, and the vessel has longitudinal stringers which are connected to this bulkhead by means of steel bracket plates fastened to it with rivets.

Prior to the voyage in question, the Willowpool had taken on about 700 tons of coal at Rotterdam, filled her forepeak tank with sea water, and proceeded, in ballast, to Fowey, England. That crossing occupied three or four days. Her master testified the weather was exceptionally bad, and, according to the chief officer, "the ship was in danger of going ashore off the Maas lightship owing to heavy northwest gales."

Upon arrival at Fowey, the forepeak tank was pumped out and found to be sound and the Willowpool prepared to receive cargo for a voyage to Portland, Me., and Philadelphia, Pa.

The cargo in question was delivered in good condition to the ship at the dock on January 14, 1930, and stowed in the bottom of No. 1 hold. The Willowpool finished loading on January 16, 1930, and left her wharf. She did not put to sea, but moored in the harbor, where between 4 p. m. and 5 p. m. the steamship Levenpool, a sister ship, while shifting berths, came in contact with the stem of the Willowpool, variously described by respondents' witnesses as a "touching," "grazing," or "scraping," and claimed by them to have been insufficient in force to have done any injury to the Willowpool. Nevertheless, her master concluded to have a survey. As there was no Lloyd's representative in Fowey, he called upon Captain John C. Wilson, master of the Levenpool, Captain James Porter, master of the Levenbridge, another sister ship, and John P. Carter, a shipping agent, who examined the Willowpool and gave Captain Bartlett the following certification:

To Whom it may Concern

"At the request of Captain Bartlett we have examined the top of the stem of the S. S. Willowpool on the forecastle head of this steamer said to have been touched by the steamer Levenpool while dropping into berth alongside.

"After examination inside and out we can find no damage. Forepeak tank sounded and found dry.

"In our opinion the ship is in a perfectly seaworthy condition and fit to proceed on her voyage.

"[Signed] James Porter Master S. S.
                                Levenbridge

"[Signed] John C. Wilson Master S. S.
                                Levenpool

"Stem also seen by me and I confirm the above.

"[Signed] John P. Carter
        "[Signed] S. E. Drake
        "[Signed] Merlin E. Smith."

The entry in the logbook reads as follows:

"Between 4 & 5 p. m. S. S. Levenpool while shifting berths collided with S. S. Willowpool damaging stem post & indenting moulding & top plate on starboard bow & breaking away cement in waterway. Strong S E wind & squally weather.

"5:30 p. m. Unmoored & proceeded to sea with the assistance of two tugboat & Pilot in charge."

The depositions of Captain Bartlett, Chief Officer Drake, and Chief Engineer Brown of the Willowpool, and Captains Wilson and Porter (Carter's deposition was not obtained) were taken at the behest of the respondents. An entry in a record book kept by Brown (Exhibit A in evidence) reads: "Jan. 16, 1930 left Fowey at 6:30 p. m."

Upon the examination of Brown, there was submitted to him by respondents "an account of coals taken on board and consumed on a voyage from Fowey to Portland, Maine, Philadelphia, New York, Antwerp and Tyne," dated April 19, 1930, and under the heading "name of port and time of sailing from" appears, "Fowey 5:30 p. m. 16/1/30."

The Willowpool put into Louisburg (Cape Breton) for an additional supply of coal and arrived at Portland, Me., on February 7. After discharging approximately one-half of her cargo, the forepeak tank was filled with sea water and she proceeded to Philadelphia, where, upon her arrival, it was found that water had leaked through the bulkhead between the forepeak tank and No. 1 hold and damaged the cargo of china clay and ball clay, the title to which had meanwhile passed to the libelant. The forepeak tank was thereupon tested by filling it with water. Two cracks were found in the collision bulkhead, one on each side of the vessel. They were V-d out, welded, and the bulkhead again tested, when two smaller leaks were found, one on each side lower down than the previous ones. These were repaired in the same manner, the tank again filled with water, and found water-tight.

The contentions of the claimants-respondents are:

1. Due diligence was exercised to make the Willowpool seaworthy, and she was in fact so at the commencement of the voyage.

2. The damage to libelant's cargo was due solely to perils of the sea.

3. The ship's bunkers at the commencement of the voyage were in all respects adequate, and due diligence was exercised in the purchase and examination of the coal.

4. The filling of the forepeak tank with water at Portland constituted an error in management for which under the law the carrier is not liable.

It is specifically urged by the respondents that the cracks in the bulkhead were caused by severe weather conditions encountered amounting to "perils of the sea," thus excusing the ship and her owner under the charter party and bill of lading which incorporates the British Carriage by Sea Act of 1924 and the rules scheduled to and applied thereby.

The charter party contains, among others, the following provisions:

" * * * Act of God, perils of the sea * * * excepted * * *. Vessel not answerable for losses through * * * any latent defect in the machinery or hull not resulting from want of due diligence by the Owners of the vessel or the Vessel's Husband or Manager."

"6. The vessel, to be at liberty to call at any Ports, in any order, to sail without Pilots, and to tow and assist vessels in distress, and to deviate for the purpose of saving life and property * * *"

The bill of lading, referred to, contains, among others, the following provisions:

"Loss or damage arising from the Act of God, Perils of the Sea, * * * or any latent defect in the machinery or hull not resulting from want of due diligence by the owners of the Steamer or any of them, or

by the Ship's Husband or Manager, always mutually excepted."

"This Bill of Lading shall have effect subject to the provisions of the rules scheduled to and as applied by the Carriage of Goods by Sea Act, 1924, and to the extent that any term hereof or incorporated herein is repugnant to or inconsistent with anything in the said rules it shall be void."

Rule 1 of article IV of the rules, forming a part of the Carriage of Goods by Sea Act of 1924, provides as follows:

"1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, and to make the holds * * * and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of Paragraph 1 of Article III.

"Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section."

Rule 2 of article IV of the rules provides:

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from— * * *

"(c) Perils, dangers and accidents of the sea or other navigable waters:

"(d) Act of God: * * *

"(p) Latent defects not discoverable by due diligence.

"(q) Any other cause arising without the actual fault or privity of the carrier, or without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

The credible evidence in this case convincingly establishes that the impact from the collision between the Willowpool and the Levenpool in the harbor at Fowey, England, was the competent producing cause of the cracks in the collision bulkhead of the Willowpool through which the water put into her forepeak tank for ballast at Portland, Me., leaked into No. 1 hold and damaged libelant's cargo en route to Philadelphia.

■ It sometimes happens that the officers of a vessel are prone to "stick by the ship." The Horaisan Maru (D. C.) 5 F. Supp. 311, 314, 1933 A. M. C. 1422; The Benjamin Noble (D. C.) 232 F. 382, 394.

In this case, the logbook belies them, and, taken together with other conflicting evidence, leads to the irresistible conclusion that the witnesses for the respondents minimized the facts respecting the damage to the Willowpool when the Levenpool fouled her at the buoys at which she was moored and exaggerated their accounts of storms at sea.

■ In the Manuel Arnus (D. C.) 10 F. Supp. 729, 732, this court held: "The weather must be irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception and not a common occurrence at that season of the year."

The weather encountered by the Willowpool was not, in my opinion, such as would constitute a "peril of the sea." In fact, Robert McGregor, a consulting engineer and surveyor, called as a witness for the respondents, testified:

"Q. This weather that has been described, in your opinion, was that usual or unusual? A. I have crossed the ocean in January and February, and that is the weather which I would expect."

In the depositions of the respondents' witnesses, no testimony was brought out to explain why the Willowpool anchored at the buoys instead of putting out to sea.

In Clifton v. United States, 4 How. 242, 246, 11 L. Ed. 957, the court said: "To withhold testimony which it was in the power of the party to produce, in order to rebut a charge against him, where it is not supplied by other equivalent testimony, might be as fatal as positive testimony in support or confirmation of the charge."

■ The real questions presented are: Did the Willowpool break ground when she left her dock, and were the injuries sustained at her moorings in the harbor an error of management during the voyage? I think not.

The term "voyage" has no fixed or technical meaning. The Brig Lucy, 39 Ct. Cl. 221, 224.

The word "voyage" may have different meanings under different circumstances, depending on the subject to which it relates. Deslions v. La Compagnie G. T., 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973.

In my opinion, a voyage commences only when the vessel breaks ground or leaves her moorings in complete readiness for sailing and proceeding to sea. Bowen v. Hope Ins. Co., 20 Pick. (37 Mass.) 275, 278, 32 Am. Dec. 213; Warn v. Easton, etc., Transit Co. (City Ct. N. Y.) 2 N. Y. S. 620, 622.

Counsel for the respondents cites the case of The Rona, 5 Asp. (Eng. M. C. 259).

In that case a wooden vessel shipped a general cargo at New York for London. She left her moorings on December 27, 1879, and was towed "down the New York River" by a tug and thence proceeded in safety until she came to the Craven Shoal "about 10 miles below New York," where she went aground and stuck fast. With the assistance of a tug she got off on the flood tide and continued on her way. It was then discovered that she was making water. She encountered heavy seas on her crossing, doing the vessel considerable damage, and shipping such quantities of water that the pumps had to be kept constantly going. Upon arrival at destination, it was found that the cargo had suffered damage. The cargo owner sued the Rona in the City of London Court for damages caused by the negligence of the shipowner and had a recovery with a reference to the registrar to assess the amount of damage. Upon appeal to the Admiralty Division of the High Court of Justice, the judgment was affirmed.

The only pertinent part of the opinion to which the advocate for the respondents calls attention is: "Now with regard to the facts of this case. We have already intimated our opinion that this voyage must be considered to have commenced from the time when the ship started from whatever were her moorings, with her cargo on board, for the purpose of proceeding down the New York Harbour and out to sea, and that therefore the warranty of seaworthiness had been fulfilled."

With that I agree. But in the case under consideration, the Willowpool, which had finished loading at 9:25 a. m., left her dock at 1:30 p. m., apparently not for the purpose of proceeding out to sea, but for some unexplained reason was moved to and moored at some buoys in the harbor and did not actually sail until 5:30 or 6 p. m.

My conclusion is, therefore, that the voyage did not commence until the Willowpool left her moorings at the buoys; that she was unseaworthy, not by reason of an error in management, but through negligent acts of omission as well as commission; that the master did not use reasonable diligence to ascertain the extent of damage after the Levenpool collided with the Willowpool and to make the latter seaworthy (see Harter Act § 3, 46 USCA § 192).

There will be a decree for the libelant.