**MISSISSIPPI SHIPPING CO., Inc., Claimant-Appellant,**

v.

**ZANDER AND COMPANY, Inc., et al., Libellants-Appellees.**

**No. 17558.**

United States Court of Appeals
Fifth Circuit.

Aug. 12, 1959.

Rehearing Denied Oct. 15, 1959.

Judgment Vacated Nov. 23, 1959.
See 80 S.Ct. 212.

Hutcheson, Circuit Judge, dissented.

Alfred M. Farrell, Jr., Walter Carroll,. New Orleans, La., Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans,. La., of counsel, for appellant.

Henry J. Read, John P. Hammond,. Montgomery, Barnett, Brown & Read,. New Orleans, La., of counsel, for appellee Zander & Co., Inc., et al.

Joaquin Campoy, Deutsch, Kerrigan & Stiles, New Orleans, La., Brunswick G. Deutsch, New Orleans, La., of counsel, for appellee J. Aron & Co., Inc.

Before HUTCHESON, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, *Circuit Judge.*

This case presents important questions under the Carriage of Goods by Seas Act (Cogsa), 46 U.S.C.A. §§ 1300–1315.[1] The principal question is whether cargo damage, in a legal sense, was caused by an "Act, neglect, or default of the master * * * or the servants of the carrier in the navigation or in the management of the ship," for which liability is excused by Section 4(2)(a) of Cogsa, or

---

1. Cogsa was originally enacted in §§ 1–16. Sections 1301–1309 correspond to original §§ 1–9, and §§ 1310–1315 correspond to original §§ 11–16. The original sections are used throughout this opinion, but may be readily found in 46 U.S.C.A. in this way.

was "caused by want of due diligence on the part of the carrier to make the ship seaworthy * * * in accordance with the provisions of paragraph (1) of Section 3" for which liability remains under Section 4(1).[2] This in turn depends largely on whether, at the time of the physical event damaging the vessel and later the cargo, the voyage had commenced. The case also points up the sharp distinctions between Cogsa and the Harter Act, 46 U.S.C.A. §§ 190–196, while, at the same time, the great similarities of the two Acts.

The facts, set forth in great detail in post-appeal findings and conclusions, have been reported, Steamship Del Sud, D.C. E.D.La.1959, 171 F.Supp. 184, 1959 A.M.C. 653, and need not be repeated here. Those fact or legal-fact conclusions which we reject under the amphibious clearly erroneous concept of McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 A.M.C. 1999, we discuss separately.

 The cargo damaged was principally coffee loaded in No. 2 lower hold of the SS Del Sud at Santos September 9 and 10, 1952, and a few cases of corned beef previously loaded in No. 2 lower tween deck at Montevideo and Buenos Aires on September 2 and 5. The vessel arrived next at Rio de Janeiro at noon

September 11 departing that night for Curacao, B.W.I., and thence her discharge port of New Orleans where damage was discovered for the first time. Only Santos and pre-Santos cargo is involved.

It is now without dispute that sea water entered through a 12-inch fracture in the bow shell plate just below the lip of overboard discharge soil line which protruded about 2 inches outboard of the surface of the hull plates. The fracture was caused by the pressure of the ship's weight bearing on this small protuberance in momentary contact against the concrete face of the dock which imperceptibly but now significantly, inclined at an angle of 7°35′ toward the vessel. The lip or drip pad of the overboard discharge line, at the vessel's loaded draft, was then about 2 feet above the water level and some 4 feet below the level of the dock. This was at the flaring contour of the bow so that the shell plating was in a plane in the shape of a spheroid. Contact between the dock and the ship's port bow was an intentional part of the traditional and purposeful maneuver of simultaneously undocking and turning the vessel around for departure from the port of Santos.

At 2133 hours September 10, the vessel, moored as customary, port side to the

2. The pertinent sections of Cogsa are these.

"Sec. 3. * * * (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

"(a) Make the ship seaworthy;

"(b) Properly man, equip, and supply the ship;

"(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

"(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C.A. § 1303.

"Sec. 4. * * * (1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 3. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * *." 46 U.S.C.A. § 1304.

dock, was made ready for sea and for her customary maneuver away from the dock. She singled up her mooring lines and a local Santos pilot came aboard to unberth the vessel. Her engines were put on stand-by at 2157 hours. The Tug Neptune made fast on the starboard quarter with a hawser in order to swing the stern of the Del Sud away from the dock out into the channel to permit her to turn about in a counterclockwise manner. By 2208 hours the stern mooring lines and all lines other than the bow spring line and breast line were cast off. The bow spring line and breast line were held fast to the dock in order to hold the port bow at the dock while the stern was brought out into the channel by means of the Tug Neptune hauling on the hawser at right angles to the vessel. Between then and 2214 hours the ship's engines were maneuvered at various speeds. At 2214 hours the engines were put full astern and at that moment the two remaining lines were cast off. It was during these maneuvers between 2208 and 2214 hours that the port shell plating of the Del Sud, just forward of the point where the curvature of the hull begins at No. 2 hold, rolled in contact with the concrete facing of the dock. This was in accordance with the plan followed by the Del Sud and her sister ship on many previous occasions on departing from Santos. The fracture resulted because the drip pad lip, from the peculiar combination of water level draft and trim, happened momentarily to take the full force of the vessel as she was rolling against the concrete dock.

It is now certain that as the Del Sud left the Port of Santos she bore an open wound in a cargo space. She was, therefore, unseaworthy in fact. The shipowner contends that this unseaworthiness was caused, and therefore excused, by a Section 4 act or error in the management or navigation of the vessel. Cargo does not really dispute this. For Cargo agrees that, unlike the former days of the Harter Act when its Section 3 (46 U.S. C.A. § 192) error in management exception was confined to events occurring after the commencement of the voyage. The Newport, 1925, 9 Cir., 7 F.2d 452, 1925 A.M.C. 1193; The J. L. Luckenbach, 1933, 2 Cir., 65 F.2d 570, 1933 A.M.C. 980, affirming D.C., 1 F.Supp. 692, 1933 A.M.C. 105, Cogsa's Section 4(2)(a) is now unconditional both as to due diligence and in point of time. Isbrandtsen Co. v. Federal Insurance Co. (The John Miller), D.C., 113 F.Supp. 357, 1952 A.M.C. 1945, affirmed per curiam, 2 Cir., 1953, 205 F.2d 679, 1953 A.M.C. 1033. Gilmore & Black Admiralty, Ch. III, Part II, 119 et seq., esp. §§ 3–25, 3–29, 3–30 (1957). Consequently had the Santos coffee been immediately damaged by the inrush of water, the Section 4 defense would have been absolute whether the ship was deemed to be on her voyage, making ready for her voyage, or simply undocking preparatory to commencing her voyage.

What Cargo contends—and has so far successfully maintained—is that the unseaworthiness resulting from the act or error in management and navigation existed prior to the time the voyage commenced, and that consequently there was a failure to perform the Section 3 duty to exercise due diligence "before and at the beginning of the voyage" to make the ship seaworthy. Cf. The Newport (G. Amsinck & Co. v. Pacific Mail Steamship Co., 9 Cir., 1925, 7 F.2d 452, 1925 A.M.C. 1193; and see Knauth, Ocean Bills of Lading 202 (1957). On this approach the Cogsa Section 4 exemption is lost, not because the event occurred prior to the commencement of the voyage, but rather because the result of it, fully manifest before the commencement of the voyage, made the ship unseaworthy. Of course, an ingredient in that thesis is that the master knew, or ought to have known, of the damage to the Del Sud while the vessel was yet in Santos so that his failure to inspect and repair was a want of due diligence. If the main premise is correct—that is, the noncommencement of the voyage—the owner would bear the consequences of the master's failure since the duty to exercise

due diligence rests upon all and is non-delegable. International Navigation Co. v. Farr & Bailey Mfg. Co., 1901, 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830.

The factual basis for this theory comes down to the proposition that the voyage could not yet have commenced because the vessel was still partly at the dock since a breast and spring line were still made fast. Support of a legal nature to that highly artificial approach is thought to be found in the Section 3 phrase "*before* and *at* the beginning" of the voyage, as though blending these two prepositions expands a "beginning" from some precise moment to a sort of continuing transitional state.

The use of "*before* and *at*" does not make the commencement of the voyage— whenever it is—any less a beginning. When the voyage begins, it is the voyage, and not the beginning of it, which continues. The dual reference is to make doubly sure that with respect to cargo then being loaded the vessel must be seaworthy at the time of the receipt of cargo and must continue in that state until the ship sails. That the duty reaches backward from commencement does not make it reach forward, as the Act prescribes that the latest point of performance is *at* the beginning. The voyage must have some place (and time) of beginning. After that, it is not the beginning, but the voyage itself which transpires.

In the light of these principles a majority of the Court therefore concludes that the voyage had commenced at the time the wound to the ship's side was sustained.

We need but briefly indicate our views. In a very real sense the voyage had begun. The ship had no further purpose at the dock. She was made ready for sea. She was being turned around for the purpose of leaving. The lines to the dock were fast not to keep her there, or to continue her stay at the wharf. They were there solely as an essential step in her navigational maneuvering. They were no less vital than the hawser to the straining tug off the starboard quarter.

The ship's engines were actively maneuvering to accomplish the swing and officers and men were stationed for simultaneous undocking and departure. The ship was literally and figuratively in the sole command of the master on the bridge.

That this may pose some conceptual difficulties in suppositious cases is not significant. By its nature the problem must be one of fact, resolved on the peculiar facts of the specific episode. Just where, short of the combination of facts presented here, the voyage must be deemed *not* to have commenced, we need not determine. The fact that in our research, and that of the skilled advocates in this cause, no one has found a case like this one attests that in the two and one-half decades of Cogsa, and nearly seven of the Harter Act, there has been no compelling need for an abstract statement of the principle in point of *time* or *place*.

We see nothing contrary to our conclusion in The Willowpool (John W. Higman & Co. v. Pool Shipping Co.), D.C.S.D. N.Y.1935, 12 F.Supp. 96, 1935 A.M.C. 1292. The ship there, unlike the Del Sud whose purpose was to swing and continue uninterruptedly out of the Port of Santos toward Rio de Janeiro, shifted from a dock to a mooring berth, during which time the collision damage was sustained. When she later departed on her voyage which then began for the first time she was unseaworthy. What we decide is consistent with the ancient observation of Judge Story that " * * * the voyage commences, when the ship breaks ground for the purpose of departure * * *." The Brutus, C.C.D.Mass.1815, 4 Fed.Cas., pp. 490, 495, No. 2,060, and see also The Buckingham (Steamship Buckingham Co. v. Pacific Transport Co.), D.C.E.D.Pa.1904, 129 F. 975, 976; Steamship Wellesley Co. v. C. A. Hooper & Co., 9 Cir., 1911, 185 F. 733, 738.

Once it is determined that the hole in the ship's side occurred after the voyage had begun within the meaning of Cogsa Section 3, the failure of the master to

inspect and repair damage at Santos was likewise an error in navigation and management and also excused under Section 4.[3] This makes it unnecessary for us to pass upon the findings that by reports the master received from the engine room, which he ignored or rejected, and sensations of a collision felt by others on the vessel, the master ought to have known that the impact against the dock was extraordinarily severe and likely caused damage.

But we must consider further the activities at Rio de Janeiro. On this short voyage (arriving Rio noon September 11, departing late that night), the No. 2 bilge showed 5 inches of water at 0800 hours September 11. The bilges were previously dry. During her brief stay there, the bilge showed 10 inches in No. 2. In retrospect, especially in light of the bilge soundings running as high as 24 inches on the voyage from Rio to Curacao, it is likely that the water then in the bilges at Rio had come in through the fracture of the hull. But the ship officers, unaware of this fracture, concluded that the five and ten inch soundings on September 11 were due to heavy rains at Santos. Cargo argues that with the soundings on September 11, plus what he ought to have known from the occurrence of the night before at Santos, the Master was charged with knowledge of what he would have seen had a close inspection of the bow near the waterline been made. Consequently, it is urged, there was an independent failure to exercise due diligence to make the vessel seaworthy prior to departure from Rio regardless of the origin of the initial hull damage. The contention is indeed a relevant one, since it seems overwhelming from the bilge soundings that it was the working of the vessel in the seas after departure from Rio that caused the entry of substantial amounts of sea water into

No. 2 hold. In point of fact it was more important to close up the hole at Rio than it had been at Santos.

But at Rio, as Cargo frankly recognizes, the duties were quite different. As to Santos, Montevideo and Buenos cargo, the voyage had long since begun. With respect to each of those cargos "the time which should be considered the commencement of the voyage, when the vessel should have been placed in a seaworthy condition" has been stated in the simplest and plainest terms by the Second Circuit in The Walter Raleigh, 1952 A.M.C. 618; affirmed Union Carbide & Carbon Corp. v. United States, 2 Cir., 1953, 200 F.2d 908, 910. "The precedents and reason leave no doubt that as to a particular cargo it should be when that cargo is lifted * * *. The Southwark, 191 U.S. 1, 13, 24 S.Ct. 1, 48 L.Ed. 65; May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 342, 54 S.Ct. 162, 78 L.Ed. 348; The President Polk, 2 Cir., 43 F.2d 695, 696, 697; The J. L. Luckenbach, D.C.S.D. N.Y., 1 F.Supp. 692, 707, affirmed 2 Cir., 65 F.2d 570." See also The Havana (Atlantic Gulf & West Indies S.S. Lines), D.C.S.D.N.Y.1942, 45 F.Supp. 244, 245, 1942 A.M.C. 595; The Oritani (Atlantic Fruit Co.), D.C.Pa.1929, 40 F.2d 522, 1930 A.M.C. 230, affirmed 3 Cir., 1931, 54 F.2d 1075; The Steel Navigator, 2 Cir., 1928, 23 F.2d 590, 1928 A.M.C. 388; Gilmore & Black, Admiralty 130 (1957).

■ At Santos, and at Montevideo and Buenos Aires, the Master stood as any other servant of the shipowner and any failure to exercise due diligence to make the vessel seaworthy with respect to cargo loaded at each respective port would be chargeable to the owner. But at subsequent ports and with respect to cargo previously loaded, the acts of the Master (and crew members) are those

---

3. In the same category is the charge and finding that more or different fenders should have been used. We regard the findings clearly erroneous which hold substantially that the plan to undock and swing the ship by rolling her bow against the dock made damage inevitable so that the ship was unseaworthy by contemplating that maneuver, or doing so in her then trim and draft.

of management and navigation excusable under Section 4 unless, as is not the case here, the particular activities are those concerning the care, custody, receipt and delivery of cargo under the principles discussed in The Germanic (Oceanic Steam Navigation Co. v. Aitken), 1905, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610; Leon Bernstein Co. v. Wilhelmsen (The Titania), 5 Cir., 1956, 232 F.2d 771, 1956 A.M.C. 754. Knauth, Ocean Bills of Lading 196–208 (1953); Gilmore & Black, Admiralty § 3–29 (1957).

Thus, in an early case Judge Addison Brown declared that failure to make repairs at an intermediate port was an error of management. "If any error was committed in this respect, I think it was an error of judgment. It was an error, moreover, pertaining to the 'management' of the ship; since the question arose after the voyage had commenced at a port of distress, far from the home port, and away from any supervision by the owners, and was wholly subject to the master's determination." The Guadeloupe, D.C.S.D.N.Y.1899, 92 F. 670, 671. This case was cited with approval in United States v. New York & O. S. S. Co., 2 Cir., 1914, 216 F. 61, 71–72, certiorari dismissed 1915, 238 U.S. 646, 35 S.Ct. 794, 59 L.Ed. 1504. "But it seems to us that, the vessel being seaworthy when she began her voyage, the failure to make inspection at an intermediate port, if such an inspection ought to have been made, must be regarded as a fault in management of the ship under the third section of the Harter Act. The Guadeloupe, D.C.1899, 92 F. 670." The court there gave its approval to the dramatic language then contained in Benedict, Admiralty § 229, that the Harter Act was "intended to relieve the shipowner who has done all that he can do to start off a well-fitted expedition, from liability for damages caused by faults or errors of his shipmen after his ship has gone below the horizon and away from his personal observation." 216 F. 61, 72. Much the same was repeated in The Milwaukee Bridge, 2 Cir., 1928, 26 F.2d 327, 330, 1928 A.M.C. 1063. "Moreover, such an act as failure to inspect the hold at St. Thomas, even if negligent, has been held by this court to be a fault in management of the ship, excusable under Section 3 of the Harter Act."

This principle, indeed these very cases, received the express approval of the Supreme Court in The Isis (May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft), 1933, 290 U.S. 333, 345, 54 S.Ct. 162, 165, 78 L.Ed. 348, 1933 A.M.C. 1565:

"If the management of the ship is in the hands of master and crew, he [owner] will be relieved of liability for supervening losses, provided only that his [owner's] own duty has been fulfilled at the beginning. If the term of management is over and the ship is in his hands again, the duty is renewed.

"The question then is when management begins and ends. * * * Upon arrival at a port of call, the master is negligent in his inspection of the ship or its equipment. Liability for the damage will not be chargeable to the owner, for this again is a fault of management. The Steel Navigator, 2 Cir., 23 F.2d 590; The Milwaukee Bridge, 2 Cir., 26 F.2d 327, 330; United States v. New York & O. S. S. Co., 2 Cir., 216 F. 61, 71; Jay Wai Nam v. Anglo-American Oil Co., 9 Cir., 202 F. 822; The Guadeloupe, D.C., 92 F. 670. Cf. Carver on Carriage by Sea, 7th ed. § 103e, collating the decisions."

The Court spelled this out in more detail. "If the master of the Isis had acted on his own responsibility at Bremen in sending the vessel on, the fault would have been negligence in management, or so we may assume. But that is not what happened. The owner intervened by its marine superintendent, who was sent from Hamburg to Bremen to inspect the disabled vessel and determine what to do. He consulted with the master and others. The decision in the end was his. * * If reasonable diligence would have shown

that the vessel was unseaworthy when he sent her on her way, there was something more than an error in navigation or management on the part of master or of crew. There was a failure by an owner to fulfill the condition on which immunity depended." 290 U.S. 333, 344, 54 S.Ct. 162, 164, 78 L.Ed. 348. Later on the Court again emphasized the intervention, and its legal significance, of the owner's shore staff who took full command of the situation at the Port of Bremen. "Here is a case where master and crew have surrendered their management and have made appeal to the owner to resume control himself. Response to that appeal destroys the continuity of the voyage, as if it were broken into stages. * * * An owner intervening in such circumstances must be diligent in inspection or forfeit his immunity. Negligence at such a time is not the fault of servants employed to take the owner's place for the period of a voyage. It is the fault of the owner personally, exercising his own judgment to determine whether the voyage shall go on." 290 U.S. 333, 346, 54 S.Ct. 162, 165, 78 L.Ed. 348.

 Presumably to satisfy these principles, Cargo proposed, and the Court adopted verbatim, a finding and legal conclusion that because the owner maintained a shore establishment in Rio "which performed all of its operating functions in that port * * *" the management of the Del Sud "was not solely in the hands of her master and crew as it is on the high seas" so that "the vessel was in respondent's hands once again, and the duty to exercise due diligence was renewed." [4]

But we reject this finding as clearly erroneous. The record does not sustain either a finding, or an implied finding, that there was a shore staff competent to, or charged with responsibility of, making inspections and arranging for or superintending the repair. Nor does it show any effort, as in The Isis, of the shore staff to supplant or supersede the ship officers and crew. Indeed, the record is uncontradicted that no one aboard the vessel had any idea that the ship then bore the wound in her port bow. Had the law charged the owner with the legal consequences of it, the ignorance of master and officers of the damage might, as Cargo vigorously contended, been imputed to them. But this does not prove the contrary, namely, that the ship's company stood aside while the port establishment took over. Indeed, the only basis for the finding is a literal use of answers to a pretrial interrogatory which proved, at most, only the nature of the port staff, not any of their actual activities,[5] and none whatsoever with respect to this call of the Del Sud on this voyage.

The result is that Cargo must fail on both counts. The initial damage was oc-

4. This is found in Conclusions of Law XI.
 "Respondent maintained a shore establishment in Rio de Janeiro which performed all of its operating functions in that port. When the Del Sud entered Rio in her damaged condition on the northbound leg of Voyage 36, her management was not solely in the hands of her Master and crew as it is on the high seas. The vessel was in respondent's hands once again, and the duty to exercise due diligence was renewed. It was incumbent upon respondent to exercise due diligence to make the Del Sud seaworthy before and at the beginning of her voyage from Rio de Janeiro to New Orleans by way of Curacao. Respondent's failure to conduct a survey or any examination of the hull of the Del Sud prior to its departure from Rio on the northbound leg of Voyage 36, in spite of the impact with the dock at Santos and in spite of the fact that she was taking water on the voyage from Santos to Rio de Janeiro (see The Willowpool [D.C.], 12 F.Supp. 96), renders respondent liable for subsequent damage to the cargo loaded at Buenos Aires and Montevideo, even though the Del Sud was seaworthy upon departure from these ports. (The Isis, 290 U.S. 333 [54 S.Ct. 162, 78 L. Ed. 348], 1933, A.M.C. 1565.)"

5. Interrogatory 43 stated:
 "Describe the shore establishments maintained by respondent at the various ports of call which were touched on voyage 36, including a statement of the number of personnel at each establishment, and an explanation of the function

casioned as a result of error in navigation. The voyage had begun and there was not a failure of the master to exercise due diligence at the Port of Santos to make the vessel seaworthy. If the damage sustained by the cargo as a result of wetting after leaving Rio may be treated as proximately resulting from a failure to inspect and repair at Rio, that error, too, was one in the management of the vessel unaffected by any act of the owner through its shore staff. The decree for the cargo must be reversed and rendered for a dismissal of the libels.

Reversed and rendered.

HUTCHESON, Circuit Judge (dissenting).

A careful consideration, in the light of the pleadings, the opening statements of counsel, and the evidence which was substantially not in dispute, of the majority's sweeping out of hand rejection of the district judge's clearly, precisely, and, I think, correctly stated findings and conclusions, has left me with the firm conviction that it is not the district judge who has been misled by able and earnest briefing, suggestion, and argumentation, but the majority, and that, on this record, it is this court's clear duty not to reverse but to affirm the judgment.

Fully realizing that, except as my reasons for making my choice commend themselves to reasonable and informed minds, my statement that I agree with the district judge adds nothing to his discredited and rejected findings, subtracts nothing from those of the majority, which in turn I reject as unwarranted and ill-advised in law, I shall, as briefly and succinctly as I can, and with as few weasel words as may be, state my reasons for my fear, indeed my firm belief, that the opinion of the majority is based on such a "highly artificial approach" to the construction of the Carriage of Goods by Sea Act as to violate with respect to it the basic principles of statutory construction, nowhere better stated than in Heydon's case.[1]

of the various departments in each establishment."

The answer as to Rio de Janeiro was as follows:

"At the ports of Rio de Janeiro, Buenos Aires and Santos, respondent's vessels are serviced by Delta Line, Inc. It is a wholly owned subsidiary of respondent and functions in the three mentioned ports in the capacity of husbanding agent, booking agent, stevedores and stevedoring supervisor and passenger agent. It performs all other functions relating to the operations of respondent at those ports.

"At Rio de Janeiro Delta Line, Inc., employs 16 persons directly. The Stevedoring superintendent is employed on a per ton fee basis. * * * The function of the various departments of Delta Line, Inc., at each port is as follows:

"Rio de Janeiro—Accounting 12— * *
 * * * * *
"Administrative 2—(manager and assistant manager.)

"The manager is responsible for the proper functioning of all his departments and, additionally, handles all contact work with shippers and receivers in connection with the booking of cargo, settlement of claims, etc. The assistant manager relieves the manager of such part of his responsibilities as the manager may find it advisable to delegate such responsibilities.

"Traffic 2 (freight agent and passenger agent)
 * * * * *
"Stevedoring Superintendent—1

"At this port the stevedoring superintendent is employed on a per ton fee basis. His duties are to supervise the loading and discharging of cargo, * *."

1. "In Heydon's Case in 1584, after all the barons of the Exchequer had argued in open court, it was unanimously resolved by Sir Roger Manwood, Chief, Baron, and the other Barons of the Exchequer:

" 'That for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law), four things are to be discerned and considered. 1. What was the common law before the making of the Act? 2. What was the mischief and defect for which the common law did not provide? 3. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth? And 4. The true reason of the remedy? and then the office of all the judges is always to make such construction as shall suppress the mischief, and advance the

It is, therefore, impossible for me to accept the conclusion of the majority that the findings and conclusions of the district judge must be rejected out of hand as clearly erroneous, and that this court, entirely uninfluenced by them, can subject the record to a substantially de novo consideration and analysis, and based thereon, make contrary findings of its own.

It seems plain to me, on the contrary, that the facts as facts are by and large undisputed, and that, where they are not, they fully support the findings of the district judge. It is clear, too, I think, that where the findings are in part concerned with inferences from facts, there is a sufficient, indeed a very strong case for the fact findings and conclusions of the district judge, that there was negligence in handling the ship in connection with the undocking (1) in not making an entry in the log of the occurrence of striking the dock with great and unusual force and (2) in not instituting an inquiry before departure from the port as to its effect, upon the seaworthiness of the vessel, and the care and protection of the cargo.

I must confess that when I come to consider what I regard as the crux of the case, the legal situation at Santos, under the Carriage of Goods by Seas Act, 46 U.S.C.A. §§ 1300–1315, and to state what I believe to be the law of the case, I find the situation most unsatisfactory. This is not because I have difficulty in concluding on principle what the decision should be. It is because, and only because, the controlling factor here is the correct construction of the applicable statute and there is no controlling decision precisely in point with the facts of the case. In short, neither the counsel, the district judge, nor the majority has

been able to point to a single authoritative decision on facts like these, and I have found none for myself. The district judge, having found and held, upon the undisputed evidence, that the ship was rendered unseaworthy by the collision with the dock, and, with ample support in the evidence that the carrier had not exercised due diligence to make it seaworthy, disposed of the case with confidence as a case of liability under Sections 3 and 4(1) of the Act, while the majority, of the view that, once maneuvering to depart the port had begun, what occurred thereafter to render the ship unseaworthy and what was done about it was of no moment because, by Sec. 4(2)(a),[2] carrier and ship were as completely exempted from liability as though the injury to the ship had occurred at sea.

For myself, I think it clear that the case may not be decided by how many lines had or had not been cast off but only by determining which in principle is the dominating portion of the statute here, the general or enabling provisions of Sections 3 and 4, imposing the duty of diligence to make the ship seaworthy, that the carrier shall be bound to exercise due diligence to make the ship seaworthy "before and at the beginning of the voyage", that is before it leaves the port, or the exceptive or limiting provision of Sec. 4(2)(a), that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from "(a) Act, neglect, or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship." In my opinion, the majority, in paramounting Section 4(2)(a), has set sail on the wrong course, while the district judge, in paramounting Section 3, has taken the right one. Instead,

---

remedy, and to suppress subtle inventions and evasions for continuance of the mischief, and pro privato commodo, and to add force and life to the cure and remedy, according to the true intent of the makers of the act, pro bono publico.' 3 Co. 7a." A Case for Three Judges, Harvard Law Review, March, 1934. p. 798.

**2.** "(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * *". 46 U.S.C.A. § 1304.

therefore, as the majority seems to think of the district judge's position representing a "highly artificial approach", I think the shoe is on the other foot and that it is the position of the majority which is the "highly artificial" one.

While it is true that maneuvering was well underway and most of the lines had been cast off, it is also true that some had not been, and, if the question of line casting is at all controlling, and I definitely think it is not, it seems to me that, unless all lines are off, it is the same for our purpose as if none were. In short, if the ship is to prevail under the line casting theory, which the majority seems to espouse, the proof must show that the act making the ship unseaworthy occurred at least after all the lines were cast off, while for cargo to prevail, it is sufficient if at least one remains uncast.

I, however, do not subscribe to either of these views. I think the question of what lines were or were not made fast, what were loose, is wholly artificial and immaterial. As I see it, the real question is, had the ship left the port of loading, in the legal sense that the voyage had actually begun, the ship was no longer in port, and its fate was no longer in the hands, and under the control, of the shore personnel, but under the control and in the hands of the master.

Looked at, as I see it, this is the law of this case. The determining questions are (1) not how many lines had been cast off and whether the ship had or had not begun the maneuver of getting away from the dock, but whether the evidence supports the finding and conclusion of the district judge, that something occurred to make the ship unseaworthy while it was still in port and, therefore, within the potential control of the shore personnel, and (2) whether the circumstances were such as to constitute it negligence not to make or cause to be made an inspection before leaving the port to determine whether the ship was seaworthy. In short is the case controlled by Sections 3 and 4(1) of the Act or by Sec. 4(2) (a).

In my opinion, the questions admit of only one answer, that given by the district judge. The view of the majority, that the injury was caused by an error in navigation and management, from the consequences of which the vessel was completely exonerated, is, I think upon the record in this case, completely erroneous, and I deprecate and dissent from the judgment of reversal.

Rehearing denied; HUTCHESON, Circuit Judge, dissenting.