## THE HAVANA.

Petition ATLANTIC GULF & WEST IN-
DIES S. S. LINES et al.

District Court, S. D. New York.
March 20, 1942.

Burlingham, Veeder, Clark & Hupper, of
New York City (Chauncey I. Clark and
Norman M. Barron, both of New York
City, of counsel), for petitioners.

Bigham, Englar, Jones & Houston, of
New York City (D. Roger Englar, T.
Catesby Jones, and W. J. Nunnally, Jr., all
of New York City, of counsel), for claim-
ants.

COXE, District Judge.

This is a limitation proceeding growing
out of the stranding of the S/S Havana on
Matanilla Shoals in the Bahamas in the
early morning of January 6, 1935. The
vessel was at the time on a voyage from
New York to Havana, with fifty-one pas-
sengers and a general cargo. After the
stranding, the passengers were removed to
another ship which responded to a distress
call, and, in the transfer, one of the pas-
sengers lost his life when a lifeboat over-
turned. Some weeks later, the vessel was
released from the strand through salvage
operations, and then towed to New York,
where she arrived on March 31, 1935. Ex-
tensive repairs were subsequently made at
Chester, Pa., after which the vessel went
back into service under the name "Yuca-
tan". As a result of the stranding, part of
the cargo was lost, and much of the remain-
der was seriously damaged.

The limitation proceeding was instituted
by Atlantic Gulf and West Indies Steam-

ship Lines, owner of the vessel, and New York and Cuba Mail Steamship Company, operator under bareboat charter from the owner, for exoneration from or limitation of liability. The claims filed in the proceeding fall roughly into two classes, namely, (1) claims for loss of life, bodily injuries, and damage to personal property of passengers and crew, and (2) claims for loss of or damage to cargo.

The right of petitioners to limitation of liability was conceded at the trial by all claimants, leaving open for determination only the broad question of liability with respect to both classes of claims. Proof of particular claims was, by stipulation, deferred until after the determination of liability.

■ The law applicable to the two classes of claims is well settled, and needs little comment. The claims in the first class for loss of life, bodily injuries, and damage to personal property of passengers and crew, are based on negligence, and are not affected by the Harter Act, 46 U.S.C.A. § 192. The Rosedale, D.C., 88 F. 324, 328, affirmed 2 Cir., 92 F. 1021; Moses v. Hamburg-American Packet Co., D.C., 88 F. 329, 330, affirmed 2 Cir., 92 F. 1021; The Arabic, 2 Cir., 50 F.2d 96. The claims in the second class for cargo loss and damage are on a different footing, and are subject to the Harter Act, 46 U.S.C.A. § 192. Under section 3 of this Act, the petitioners are entitled to exoneration from liability "for damage or loss resulting from faults or errors in navigation or in the management" of the vessel, provided they exercised "due diligence" to make the vessel "in all respects seaworthy and properly manned, equipped, and supplied". This duty to exercise due diligence is independent of causal connection with the damage or loss, and the burden of making the necessary showing in that respect is on the petitioners. May v. Hamburg, etc., Gesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348. The test of seaworthiness is "whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport". The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241. And the time for applying the test is at the commencement of the voyage. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; The Oritani, D.C., 40 F.2d 522, affirmed 3 Cir., 54 F.2d 1075.

The petitioners assert that the stranding of the Havana was caused by "faults or errors in navigation". They contend with respect to the claims in the first class that these "faults or errors in navigation" were errors in judgment and did not constitute negligence. With respect to the claims in the second class they say that they have made the required showing to entitle them to exoneration from liability. The claimants, on the other hand, take the position with respect to the claims in the first class that liability for negligence has been established. They contend with respect to the claims in the second class that the showing of the petitioners is insufficient insofar as it concerns the seaworthiness of (1) the compasses, (2) the steering gear, and (3) the condensers and boilers.

The Havana (later renamed "Yucatan") is a twin screw steel steamship 429.8 feet long, 50 feet beam, and 30 feet moulded depth, built originally by William Cramp & Sons, Philadelphia, in 1907, on a heading of 312 degrees true. During the first World War the vessel was taken over by the government and used as a hospital ship. Before being returned to the petitioners she was extensively reconditioned in 1927 at Todd Dry Docks, Inc., Seattle, on a heading of 180 degrees true. She was received back by the petitioners in 1928, and from 1928 to June, 1932, was engaged in regular service between New York, Havana and Mexico. In June, 1932, the vessel was laid up afloat at a pier in Brooklyn on a heading of 129 degrees true, where she remained until September, 1934. She was again placed in service on the New York-Havana-Mexico run on October 10, 1934, and had, just before that, passed her annual inspection for seaworthiness. She held the highest class rating in the American Bureau of Shipping. Prior to starting on her first voyage No. 62 after the long lay-up from June, 1932, to September, 1934, her compasses were repaired and put in condition by T. S. & J. D. Negus, expert compass adjusters of wide experience at New York, and on October 10, 1934, the date when voyage No. 62 commenced, John C. Negus, a member of the Negus firm, adjusted the standard and steering compasses on board the vessel. The vessel was equipped with eight Babcock & Wilcox water-tube boilers, and her indicated full speed at 88 revolutions was 14¾ knots.

The Havana completed three full round voyages (Nos. 62, 63 & 64) on the New York-Havana-Mexico run prior to the commencement of the ill-fated voyage (No. 65) which terminated in the stranding on Mata-

nilla Shoals, and on none of these three voyages was any difficulty experienced with respect to the compasses, engines, steering gear or other equipment of the vessel.

Voyage No. 65 commenced on January 3, 1935. The master of the vessel was Petersen, who had been in the employ of the New York and Cuba Steamship Company, one of the two petitioners, for over fifteen years and had seen extensive service as master of numerous ships operating in the New York-Havana-Mexico run. His record during all this period had been unblemished. The other officers were Nordskog, chief officer; Rigoulot, 2d officer; Ulrich, 3d officer; and Rich, 4th officer.

The Havana left Pier 14 at the foot of Wall Street on January 3, 1935, at 4:32 P. M., and proceeded out past Quarantine and through the Narrows. She took her departure at 6:30 P. M. from Scotland lightvessel, which was passed about one mile off to starboard.

At 6:35 P. M. the master set his course for Barnegat at 188 degrees by standard compass, intending to make good 180 degrees true, allowing 3 degrees E. deviation, and 11 degrees W. variation. At 7:05 P. M. Shrewsbury buoy was abeam to starboard 1½ miles, and at 7:52 P. M. Sea Girt was abeam 7 miles, both by four-point bearings. At 8:50 P. M., when the vessel was about 7½ miles above Barnegat lightvessel, the course was changed to 200 degrees by standard compass, which, the master figured, would give him a true course of 193 degrees, allowing 3 degrees E. deviation and about 10 degrees W. variation. During the run from 6:35 P. M. to 8:50 P. M. the vessel hauled out on several occasions while passing "tows and other ships".

The vessel continued without change on this course of 200 degrees by standard compass until 5:30 A. M. on January 5, or well pass Diamond Shoals. At 9:18 P. M. on January 3, Barnegat lightvessel was abeam two miles by four-point bearing. From there on to Diamond Shoals observations and radio compass bearings were obtained, which showed the vessel close to her desired course. Diamond Shoal lightvessel was passed at 4:57 P. M. on January 4, an estimated half-mile to starboard. The total distance steamed on this run of 20 hours from 8:50 P. M. on January 3, when the vessel was about 7½ miles above Barnegat lightvessel, to 4:57 P. M. on January 4, when the vessel passed Diamond Shoals lightvessel, was 295½ miles, which gave a speed of 14.8 knots, or slightly better than the dead reckoning speed of about 14¾ knots for 88 revolutions.

In the navigation of the Havana below Diamond Shoals, the master used a chart (Ex. 63) containing a red ink line labeled "(193 degrees)" running from Diamond Shoal lightvessel to a position 32 degrees 15' N., 76 degrees 05' W., and a further red ink line labelled "(209 degrees)" running from there to Matanilla lighted buoy. These red ink lines were placed on the chart pursuant to instructions of Captain Petersen at the start of the voyage No. 62 by Hill the 2d officer at that time, to indicate the true course to be followed below Diamond Shoals.

After passing Diamond Shoals lightvessel at 4:57 P. M. on January 4, the master held to the course of 200 degrees by standard compass, which he had been on since 8:50 P. M. on January 3. He followed this course until 5:30 A. M. on January 5, when he estimated by what is called "dead reckoning" that the vessel had reached the position of 32 degrees 15' N., 76 degrees 05' W., this being the turning point shown by the red line on his chart. The distance from Diamond Shoals lightvessel to this position was about 175 miles, and the master figured that he was making good a course of 193 degrees true, allowing 3 degrees E. deviation, 6 degrees W. variation for the locality of Diamond Shoals, and about 4 degrees W. for the Gulf Stream. According to the Coast Pilot, issued by the U. S. Department of Commerce, the appropriate allowance for the Gulf Stream was only 1½ degrees, and Commander Denebrink, a navigation expert called by the petitioners, placed the 5:30 A. M. dead reckoning position of the vessel about 11 miles west of the master's estimated position.

At 5:30 A. M. on January 5, the course was changed to 208 degrees by standard compass in order to conform to the red line which showed a course of 209 degrees true to Matanilla buoy. In making this course of 208 degrees by standard compass, the master figured that his true course was 209 degrees, allowing 2½ degrees E. deviation, 3½ degrees W. variation, and 2 degrees E. for leeway. At 7:40 A. M. Rigoulot, the 2nd officer, obtained an observation from which he determined the deviation of the standard compass to be 2 degrees 15' E. on a heading of 208 degrees

by standard compass. Radio compass bearings at 8:04 A. M. gave the bearing of the vessel from Cape Hatteras as 194.5 degrees, and from Cape Lookout as 178 degrees, and at 8:07 A. M. from Folly Island as 108 degrees. The master disregarded the Cape Hatteras bearing as unreliable but used the Cape Lookout and Folly Island bearings because they crossed on the red line.

At 8:30 A. M. on January 5, Rich, the 4th officer, determined the longitude position at 76 degrees 37' W. by observation of the sun, and the latitude at 31 degrees 40' N. by dead reckoning. The same officer, at 8:45 A. M., found the deviation to be 3 degrees E. on course 208 degrees by standard compass. Rigoulot, the second officer, obtained a time sight at 8:57 A. M. and determined the longitude position at 76 degrees 40' W. by sun, and the latitude at 31 degrees 34' N. by dead reckoning. Ulrich, the 3d officer, obtained a further time sight at 9 A. M. and determined the longitude position at 76 degrees 40' W. by sun, and the latitude at 31 degrees 32' N. by dead reckoning. These three forenoon longitude positions obtained by the officers by observation of the sun indicated to the master that the vessel was west of the red line, and at 10:15 A. M. he altered the course to 205 degrees by standard compass, or 3 degrees to eastward "so as to get back to the red line". He figured that this would give him 207 degrees true, allowing 2½ degrees E. deviation, 2½ degrees W. variation, and 2 degrees for leeway. He estimated that the vessel had made 69 miles from the 5:30 A. M. position, using a speed of 14 knots, rather than the full speed of 14¾ knots, due to a current of about ½ knot running north. He did not, however, lay down any dead reckoning track on the chart to aid him in ascertaining his position.

The position of the vessel at noon, on January 5, appears in the log as 30 degrees 53' N., 77 degrees 00' W. The latitude of this position was determined by the master by his own observation of the sun, which checked with similar observations of two of the officers. The longitude position was determined by averaging the morning longitude position of the officers, run forward to noon, with the master's estimated position at 5:30 A. M., run forward to noon. This noon position led the master to think that the vessel was "setting a little more to the west", but he made no change in the course at that time. After 1 P. M. the weather became heavily overcast, and it was no longer possible to obtain observations. There was, however, a star sight obtained by Ulrich, the 3d officer, at about 1:30 A. M. on January 6, which even Ulrich did not consider "a good sight", and it played no part in the navigation.

At 7:40 P. M. a radio compass bearing was received from Jupiter marked "36 degrees doubtful", which indicated to the master that he was "west of the red line a few miles". The master accordingly changed the course at 8:15 P. M. to 200 degrees by standard compass, or 5 degrees to the eastward, with the idea of making good 207 degrees true, allowing 2½ degrees E. deviation, ½ degree W. variation, and 5 degrees for leeway. He estimated that the vessel had traveled 115 miles at 14 knots from the noon position to 8:15 P. M., when the course was changed to 200 degrees by standard compass, and he said that he changed the course to "allow for leeway at that time because the wind was increasing and the sea was increasing". The weather as shown by the log book was "Wind E—Overcast, strong breeze, rough sea. Vessel rolling heavily, shipping water fore and aft" from 12 M. to 4 P. M.; "Wind E—Overcast, strong breeze reaching gale force at times, vessel rolling and pitching heavy and taking water over all" from 4 P. M. to 8 P. M.

At 9:50 P. M. the speed of the vessel was reduced from 88 revolutions to 82 revolutions "due to increasing wind and sea and ship rolling heavy," which reduction was equivalent to a decrease in speed of about 1 knot. At 10:21 P. M. a radio compass bearing was received from Jupiter marked "33 degrees doubtful", which placed the vessel about 12 miles west of the red line, and influenced the master to believe that "due to the increasing wind and sea" "the vessel was still setting westerly". The course was accordingly altered at 10:40 P. M. 5 degrees more to the eastward, or to 195 degrees by standard compass. The master said that this change was to make good 207 degrees true, allowing 2½ degrees E. deviation, 0 degrees variation, and 10 degrees E. for leeway; and, further, that the purpose was to bring the vessel over to the red line. He estimated the distance travelled between 8:15 P. M. and 9:50 P. M. as 22 miles, and between 9:50 P. M. and 10:40 P. M. as 11 miles. He said that his usual allowance for leeway in this locality was "generally around 4 degrees".

The weather from 8 P. M. to midnight, as shown by the log book, was "Wind S. E.—Overcast, strong breeze, reaching gale force at times, rough sea. Vessel rolling and pitching heavily, passing heavy rain squalls". Around midnight the weather "improved somewhat", and at 12:15 A. M. full speed of 88 revolutions was resumed. The master estimated that the vessel had made about 20 miles from 10:40 P. M., when the course was changed, to 12:15 A. M., when the speed was increased.

At 12:03 A. M. on January 6, a radio compass bearing was received from Jupiter marked "58 degrees doubtful". This radio bearing as shown on the chart intersects the red line about 11 miles above Matanilla buoy, yet it indicated to the master that the vessel was about 40 miles east of the red line—it was "so far to the east of the red line" that he "just ignored" it and "asked for another bearing". At 12:37 A. M. a further radio compass bearing was received from Jupiter marked "49.45 degrees doubtful", to which was added "Your minimum slips around about twenty degrees due to night effect". The master thereupon laid off 10 degrees to the east and 10 degrees to the west of the bearing, and decided to take the 10 degrees to the west because it more nearly corresponded to his "calculations all the way down to that time" and placed the vessel "about near the line you (he) wanted to be on". Despite these two radio compass bearings, which Denebrink thought should at least have been treated as "danger bearings", the master continued on course 195 degrees by standard compass.

Shortly after the receipt of the 12:37 A. M. radio bearing, Captain Petersen had "some discussion" with Nordskog, the chief officer, but could not recall just what it was about. Nordskog testified that he differed with the master regarding the speed of the vessel, he maintaining that the speed was "close to 15" knots, while the master insisted it was only "about 13½ to 13¾ knots". According to Nordskog, the master wanted to change the course at 2:30 A. M., which Nordskog thought "entirely too late". Finally, the master agreed to "change the course at 1:30 for Jupiter", and with this assurance Nordskog turned in "shortly before 1 o'clock". The master left the bridge about 1:15 A. M., but before leaving he instructed Ulrich, the 3d officer, who was on watch at the time, to report to him at 2 A. M. for orders. The master then went to the chart room, where he sat down and "might have dozed off". Later, Ulrich came to the chart room for orders, and the master directed him to change course at 2:30 A. M. to 215 degrees by standard compass. He also told Ulrich to call him before 4 A. M. "because I want to see when we take up the light of the buoy at Matanilla Shoals". The master then "dozed off again", and was only awakened when he heard the telegraph ringing. He thereupon jumped into the pilot house where he saw Ulrich ring full speed astern, and then felt a bump as the vessel stranded. He saw the course marked on the slate at 215 degrees, and noted the time as 3:45.

The log book contains an entry that the course was changed to 215 degrees at 2:30 A. M. This entry is in the handwriting of Ulrich, and he testified before the Local Inspectors in May, 1935, that the change was made at that time. In the present case, Ulrich testified that the course was changed at 3:30 A. M. and not at 2:30 A. M. His only explanation of the log entry was that it was a "mistake", and he said regarding his testimony before the Local Inspectors that he thought he was being asked about "what was in the log book". Polaner, the quartermaster on watch at the time, also testified that the course was changed at 3:30 A. M., yet he too testified before the Local Inspectors that the change was made at 2:30, and he gave a sworn statement to the same effect to the proctors for the claimants. Despite these contradictory statements made by the two witnesses, I think they told the truth in the present case, and I find as a fact that the course was changed at 3:30 A. M. and not at 2:30 as shown by the log book.

The stranded position of the vessel was ascertained on January 6, to be 27–23 N., 78–48 W. This position is about seventeen miles east of Matanilla buoy. It is also about 6½ miles west of the dead reckoning position indicated on the charts used by Denebrink showing the dead reckoning track of the vessel from the noon position to 3:45 A. M. This set of 6½ miles to the west was the equivalent of about 1 degree over the run of 231 miles from the noon position, and might well be accounted for by the east wind of varied strength prevailing during the run.

The facts as above outlined are not in any serious dispute, and I think they show clearly that in the run below Diamond

Shoals errors in navigation were committed which caused the stranding. Denebrink made an exhaustive analysis of the navigation during this part of the voyage, and his values for deviation and variation did not differ materially from those used by the master. I think, therefore, that I am justified in accepting the deviation and variation allowances made by the master in the run below Diamond Shoals as substantially accurate.

The first major error was at 8:15 P. M. on January 5, when the course was changed to 200 degrees by standard compass, or 5 degrees to the eastward in order to allow "for leeway at the time because the wind was increasing and the sea was increasing". What actuated the master in making this allowance for leeway was a growing belief that the vessel was being set to the westward—a belief which was not only unfounded, but. was unsupported by any navigational data then available.

The genesis of this mistaken belief that the vessel was being set to the westward will be found in the earlier navigation commencing at 5:30 A. M. on January 5, when the master estimated that he had reached the position of 32 degrees 15' N., 76 degrees 05' W., which was the turning point of his red line. If the master had properly plotted his dead reckoning track for the run of 12½ hours from Diamond Shoals (compass course 200 degrees by standard compass, corrected for his value of deviation and for the mean variation shown by the chart, and speed of 14¾ knots at 88 revolutions) and had then applied the appropriate allowance of 1½ degrees for the Gulf Stream, he could not have failed to see that his estimated 5:30 A. M. position was considerably west of the red line. He thought, however, that he was right on the red line, and he accordingly altered the course at 5:30 A. M. to 208 degrees by standard compass, which, he figured, would give him a true course of 209 degrees to correspond to the red line. Then, when the three bearings were received from Cape Hatteras, Cape Lookout and Folly Island, he accepted the easternmost cross formed by the intersection of the bearings from Cape Lookout and Folly Island because it seemed to verify his estimated 5:30 A. M. position; he disregarded entirely the westernmost cross formed by the intersection of the bearings from Cape Hatteras and Folly Island as unreliable.

At 8:30 A. M., 8:57 A. M. and 9 A. M., three of the officers were able to obtain sunsights, from which they determined longitude positions indicating that the vessel was about 7 miles west of the red line. The master, without giving any thought to the possibility of error in his 5:30 A. M. position, concluded from this that the vessel was being set to the west, and at 10:15 A. M. the course was changed, to 205 degrees by standard compass, which, the master figured, would give him a true course of 207 degrees, allowing 2 degrees "for leeway". This allowance of 2 degrees for leeway had no direct relation to the stranding, but its importance lay in the fact that it planted in the mind of the master an idea that the vessel was being set to the westward—an idea which took dangerous shape when the later leeway allowances were made.

The logged position of the vessel at noon on January 5 was determined by observation, and is sufficiently accurate to serve as a starting point for a dead reckoning track. No observations were taken after that prior to the stranding, with the single exception of the 1:30 A. M. starsight, which was deemed unreliable.

At 7:40 P. M. the first radio compass bearing was received from Jupiter marked "36 degrees doubtful", which, when plotted on the chart, indicated to the master that the vessel was "a few miles" farther west of the red line than at noon. The normal error of the bearing was 2 degrees, yet the master seems to have assumed that it was correct, and at 8:15 P. M. the course was altered 5 degrees to the eastward to allow "for leeway". Had the master at this point laid down a proper dead reckoning track on the chart, he would have seen that the allowance of 5 degrees for leeway took him directly into perilous waters.

The second major error was at 10:40 P. M. when the course was again changed 5 more degrees to the eastward, or to 195 degrees by standard compass, thereby increasing the allowance for leeway to 10 degrees. The master was influenced to make this change by the 10:21 P. M. radio compass bearing marked "33 degrees doubtful", which placed the vessel about 12 miles farther to the westward than he thought she was at 7:40 P. M. He did not consider the possibility of error in the bearing, even though it was marked "doubtful", and he again failed to lay down a deed reckoning track to see where his

changed course led him. Denebrink testified that the 10:21 P. M. bearing was actually 9.6 degrees in error to the westward.

I think this total allowance of 10 degrees for leeway did more than anything else to bring about the stranding. It was not only bad navigation practice to make any allowance for leeway at all, but the leeway actually allowed was excessive by at least 6 degrees, as shown by plates prepared by Denebrink.

The master was also in error in failing to treat the 12:03 A. M. and 12:37 A. M. radio compass bearings from Jupiter as danger bearings. The 12:03 bearing, when plotted out on the chart, showed the vessel "40 miles to the east" of the red line, and the master "just ignored that bearing." Denebrink said that the bearing as plotted on the chart "definitely warns the navigator that he is approaching dangerous water", and that he "must always accept the worst possible information rather than the best possible information". The 12:37 A. M. basic bearing, when plotted on the chart, indicated that the vessel was about 10 miles to the eastward of the red line, but the accompanying message contained a warning that "Your minimum slips around about twenty degrees due to night effect". The master laid off 10 degrees to the east and 10 degrees to the west of the bearing, and accepted the 10 degrees to the west because it placed him near the line he "wanted to be on". Here again he was fortifying his own preconceived notions about the westerly set, and excluding from his mind any possibility that his earlier calculations might be wrong. Denebrink said that the basic bearing was actually only 0.2 degrees in error. It should at least have served as a danger warning.

The master was further in error in his estimate of the speed of the vessel from the noon position on January 5. He figured that the vessel was making 14 knots, except for the period between 9:50 P. M. and 12:15 A. M. when the engines were running at 82 revolutions, and during this latter period his estimate was 13 knots. He based his calculations on an assumed set of about one-half knot against the vessel. The dead reckoning speed for 88 revolutions was 14¾ knots, and the average speed for the 231 miles travelled from noon on January 5 to 3:45 A. M. on January 6, was 14.7 knots, showing conclusively that the vessel was not appreciably held back by current. The master admitted that he was proceeding faster than expected, and his explanation was that "we didn't have the usual current I expected we would have". This underestimate of the speed clearly played a large part in the stranding, for the master did not expect to pass the buoy until 5 A. M., indicating that he had no idea that he was as close to the reef as subsequent events proved.

I find, therefore, that the stranding was caused by errors or faults in navigation amounting to negligence.

I turn now to the question whether due diligence was exercised to make the vessel "in all respects seaworthy and properly manned, equipped and supplied" at the commencement of the voyage. As already stated, the issue on this branch of the case has been limited to the seaworthiness of the compasses, the steering gear, and the condensers and boilers.

The claimants first attack the showing made by the petitioners with respect to the compasses on three main grounds, namely, (1) that the compasses were not properly compensated, (2) that the deviation records were inaccurate and unreliable, and (3) that the compasses were unreliable as shown by actual performance on voyage No. 65. These three grounds will be considered separately in the order named, and will be limited in their application to the standard compass alone, which was the navigating compass of the vessel.

The standard compass was completely overhauled in October, 1934, by T. S. and J. D. Negus, expert compass adjusters of unquestioned ability and wide experience. It was then compensated by John C. Negus, a member of the Negus firm, on October 10, 1934, just before the commencement of voyage No. 62; and the testimony of the officers was that it operated consistently during all of the succeeding voyages prior to the stranding.

The claimants first say that the compensation of the compass on October 10 was hastily performed in a restricted area without steadying long enough on a sufficient number of headings to enable a proper deviation card to be prepared. The evidence shows, however, that Negus was on the vessel from 11:54 A. M. to 1:47 P. M., that from 12:33 P. M. to 1:45 P. M. the vessel was swung twice in a comparatively large area in the lower bay, and that the

vessel was steadied long enough on the principal headings to obtain correct deviaations. It is further insisted that the vessel was not on an even keel when the compass was compensated as advised by recognized authorities on compass adjustment. It is true that the vessel had a slight list of 1½ degrees to starboard at the time of compensation, and that fact is noted on the Negus deviation card. But, as Negus explained, the compass had been compensated before for heeling error, and he was careful to see that the heeling magnet was in place, and he made the necessary adjustments for heeling error. The claimants also assert that a tug was used to push the vessel around while the compass was being compensated. This assertion is based on some testimony to that effect by Hill, the 2d officer on voyage 62, but it was shown that Hill was not even on watch at the time, and both Negus and Captain Petersen stated positively that no tug was used to push the vessel around during the compensation. On this testimony, I find as a fact that no tug was used during the compensation.

It is next insisted that the deviation records were inaccurate and unreliable. These records consisted mainly of the Negus deviation card for the standard compass, dated October 10, 1934, and the compass observation books, containing 129 recorded compass bearings taken by the different officers on various headings on voyages 62, 63, 64 and 65. In addition to the recorded bearings, Captain Petersen frequently took compass bearings, and worked out his own deviations, which he said checked closely with the deviations recorded in the compass books. Denebrink made a painstaking analysis of the 129 recorded bearings, and, with the aid of the personal work books of the different officers, recomputed the different deviations. His general conclusion regarding the recorded deviations was as follows: "The deviations in the compass record book for the standard compass were, within narrow limits, accurately arrived at, so accurately arrived at that the deviations which the master used were for all practical purposes sufficiently accurate to navigate the ship properly."

With this conclusion, I am in entire agreement, and I do not think it will accomplish any useful purpose to review the evidence on the subject in any detail. It is quite obvious that after the long lay up prior to October 10, 1934, the Negus deviation card could not serve as a satisfactory guide for any considerable period. I doubt, also, whether the recorded deviations for voyage No. 62 are of any real help in determining whether the deviation records at the commencement of voyage No. 65 were trustworthy or not, for it was to be expected that during voyage No. 62 the deviation values would change, due to the shaking out of much of the temporary magnetism accumulated in the lay up. These changes were, however, all perfectly normal, and do not show any erratic performance of the compass. The recorded deviations on voyages 63 and 64 check closely with those obtained on voyage 65 for comparable headings, and I think they gave the master all the necessary data to enable him properly to navigate the vessel, even though the duty of obtaining this data still rested on his shoulders as part of the navigation of the vessel. See The Oritani, D.C., 40 F.2d 522, 528, affirmed 3 Cir., 54 F.2d 1075.

The contention that the compasses were unreliable, as shown by actual performance on voyage No. 65, requires little consideration. The argument is that the vessel failed to make good her courses on the run to Diamond Shoals. The best answer to this argument is found in the performance of the vessel during the run of 295½ miles from the 8:50 P. M. position January 3, 7½ miles above Barnegat lightvessel, to Diamond Shoals lightvessel, which was passed a half-mile to starboard at 4:57 P. M. on January 4. Throughout this entire run of 295½ miles, the vessel was on a course of 200 degrees by standard compass, without a single alteration, and Denebrink estimated that she made good a course at Diamond Shoal lightvessel only 4¾ miles to the eastward of the true course steered, which was substantially the same as the estimate of Captain Petersen. Denebrink's testimony regarding the performance of the standard compass on this run was as follows: "I will state that in my opinion, the progress of the 'Havana' from 8:50 P. M. above Barnegat down to Diamond Shoals lightship, without a single alteration of course, in my mind represents a magnificent performance of the compass, and a minimum manifestation of the variables that a ship has offered against that progress".

This brings me to the criticism of the claimants that the steering gear of the vessel was defective. The basis of this criticism is the testimony of Polaner, one of the

quartermasters (called as a witness by the petitioners), that there was "one turn slack in the cable of the steering gear", which made it "a bit difficult to judge amidships on the wheel". Polaner testified, however, that the vessel "was a good steering ship, almost as good as any I ever been on". On cross-examination, he admitted the truth of a previous statement he had given to the proctors for the claimants, in which he said "It was almost impossible to tell when your rudder was midship, even with the rudder angle indicator on the forward bulkhead of the wheelhouse". All that this testimony amounts to is that Polaner thought there was some slack in the wires leading to the wheel in the wheelhouse, which, if it had existed, could of course have been corrected as part of the operation of the vessel. Nordskog, the chief officer, who had direct supervision of the steering gear, and inspected it every morning when the vessel was under way, testified that "the steering gear on voyage 65 was in perfect condition", that the slack was only normal, and that there was no complaint from anyone regarding the steering gear or the rudder angle indicator. Ulrich, the 3d officer, whose duty it was to see that the steering gear was in good condition at the start of the voyage, said that he examined and tested the steering gear before the vessel left her pier on January 3, and found everything in good condition.

The claimants in their briefs have limited their attack on the boilers and condensers to the condensers alone, which, they insist, were unseaworthy "by reason of serious leaks". The vessel had two main condensers, each with 2,380 tubes, or a total of 4,760 tubes for both condensers. The condensers were completely retubed in 1929, and were afterwards maintained in good condition. Admittedly, there was some tube leakage on voyages Nos. 63, 64 and 65, but it was so slight as to be almost negligible, and it never caused any stoppage or slowing down of the vessel. Prior to the commencement of voyage No. 65, both condensers were tested and examined, and, after it was found that a few ferrules were "seeping around the packing", these were tightened, and the condensers were left in "good condition". All of the engineers testified positively that the condensers operated satisfactorily up to the time of stranding.

The claimants make two contentions in support of their claim that the condensers had "serious leaks". They first say that "large quantities" of a sealing preparation called "Wizard compound", and referred to as "sawdust", were used to control the leakage on voyages Nos. 64 and 65, indicating that extensive leakage existed on both voyages. The answer is that "large quantities" of the sealing preparation were not used on either of these voyages, and, further, that the evidence shows conclusively that the leaks which developed were only such as might reasonably be expected in normal operation of the vessel. The second contention is based on the testimony of Suarez, the 1st assistant engineer, that it was the practice "to change the water" in the boilers whenever the vessel arrived at Havana or Vera Cruz. From this, it is argued that the boiler water was invariably "dumped" on arrival at Havana or Vera Cruz because it was so badly contaminated by leakage that it could not be used safely. Suarez testified by deposition, and it is not clear whether he used the word "change" in the sense of "dump" or not; but in any event the evidence shows that it was not the practice to dump the boilers at Havana or at Vera Cruz, but rather to wait until the vessel reached New York. On the entire evidence, I find that the condensers were seaworthy at the commencement of voyage No. 65.

In summation of the evidence on this branch of the case, I find that the vessel was in all respects seaworthy and properly manned, equipped and supplied at the commencement of voyage No. 65.

■ There may be a decree (1) holding the petitioners liable on the claims for loss of life, bodily injuries, and damage to personal property of the passengers and crew of the vessel, and referring the case to a commissioner to determine the damages recoverable on such claims; and (2) exonerating the petitioners from liability on the claims for loss of or damage to cargo; all with costs to the successful parties.